## 26387. STANSFIELD v. GARDNER.

DECIDED OCTOBER 8, 1937.   REHEARING DENIED NOVEMBER 4, 1937.

*J. Howell Green,* for plaintiff.

*Bryan, Middlebrooks & Carter, B. Hugh Burgess,* for defendant.

SUTTON, J.   Charles A. Stansfield brought suit against W. A. Gardner for damages on account of injuries which he sustained because of alleged negligence of the defendant at a time when the plaintiff was a patient in the private hospital operated by the defendant. The defendant denied the material allegations of the petition, and specially pleaded that the plaintiff was placed in the hospital by his parents under an original agreement that the defendant was to be paid $50 as an admission fee, $35 per week for room and board, and $25 per week for a special attendant for the patient; that in January, 1935, the father requested the defendant to dispense with the special attendant, and it was agreed between the father and the defendant that the defendant would not furnish the patient with a special attendant at all times, but would furnish such an attendant only when the patient was out of the hospital building for walks, exercise, etc.; and that thereafter the total charges for all services rendered to the patient, including room and board, were reduced to $50 per week, including the services of a special attendant while the patient was outside of the hospital building. The jury returned a verdict in favor of the defendant. The plaintiff filed a motion for new trial on the general grounds and on several special grounds which are hereinafter referred to. The exception is to the judgment overruling the motion for new trial.

The material evidence on the trial of the case was substantially

as follows: The plaintiff, before his illness which made necessary his treatment in the hospital of the defendant, was an adult young man of superior mentality. He had received a master of arts degree from a university of note, and was further prosecuting his studies for a doctor's degree when he suffered a nervous breakdown which resulted in temporary insanity. On or about August 18, 1934, at the instance of his parents he was placed in the institution of the defendant at Stone Mountain, Georgia, in order that he might be properly cared for and treated for his mental condition. The defendant made an admission charge of $50, and it was agreed that the father would pay $35 per week for the son's board and $25 per week for a special attendant. The defendant, who was a physician, and was a specialist in nervous and mental diseases, subsequently diagnosed the patient's mental condition as dementia præcox. There was testimony from one or two other physicians that it was of the manic depressive type. It was shown that a person suffering from the latter type is susceptible to contrasting moods, sometimes experiencing a feeling of lofty well-being, manifested by intense activity, and at other times falling into marked depression, in which last-named condition there is a frequent tendency to commit suicide. In the case of dementia præcox there is sometimes, though less often than in the other type, a similar tendency. The plaintiff, who had been declared to be fully recovered, testified that he could recall that in his stay at the hospital he was often disposed to destroy himself, and meditated on how he might accomplish that end, but that the opportunity did not present itself. Attendants and his nurse testified that at no time did he indicate that in his condition he might harm himself. One of the attendants testified that he had accompanied him to the top of Stone Mountain, an enormous monolith in the vicinity of the hospital; and that the plaintiff had been near the edge thereof, but made no effort to commit suicide by jumping or otherwise; and that during their walks he had many opportunities to throw himself in front of automobiles, but never did. It was found necessary, in the early part of his stay at the hospital, to confine the patient in a room fortified by bars, in order to prevent his escape and to properly protect him. But there was testimony that he had gradually improved, had gained weight, and his mental condition was such, shortly before

the injuries sued for, that he realized the need of the treatment he was receiving, expressed a desire to co-operate; and the defendant had written to the patient's father that he hoped the son would be able to return home in a few weeks. The plaintiff, however, testified that about a week before the occurrence he had been confined in the "locker," but, although at the time of the injury he was rooming on the second floor, where patients were not in barred rooms, he had little confidence in himself, and so expressed himself to the defendant.

As the case involves the question of what care and attention the plaintiff was entitled to receive as a patient, it is pertinent to set out here certain correspondence between the father of the plaintiff and the defendant. On January 28, 1935, the father wrote to the defendant as follows: "It is the financial circumstances under which I am laboring prompts me to write you this letter. Yet bear in mind I do not wish 'to be penny wise and pound foolish' in the matter; therefore I am leaving it entirely up to your judgment, and will abide entirely by what you say. I am wondering if we could reduce Mr. Gillman's [the attendant's] services, say one half, or give Chas. half a day, or every other day, and thus reduce my bill $12.50 a week or $50 per month. Say from Feb. 1st for two weeks. As time goes on you know my indebtedness to you is increasing every week. This I regret, and circumstances are so I see no chance to better them. Also I have thought that after a trial as suggested above, that if he still improves and becomes more and more normal, that we might try dispensing with Mr. Gillman's services and throwing him entirely on his own man, restricting him as to territory, and time to come back to report, for meals, and keeping him in after supper until retirement time. Of course, this is to be taken into consideration, that his mind had improved to the extent that you can have a heart-to-heart talk with him. If he is back to anywhere near normal, and he will give you his word to comply in every respect to your wishes, he will in no way violate it. If you wish, you might state to him this was a request from me. Also, at the same time, if you say so, I will write him this is my wish. Now frankly just what do you think of the above? Is it worth while trying out? Again, Doctor, please bear in mind I am not dictating or telling you how to run this case, but a suggestion for your judgment to decide.

Also in the hopes that we can lighten the financial strain, as well as keep you paid up as near as possible along as we go." In reply to that letter the defendant wrote under date of February 4, 1935, as follows: "In reply to your letter of January 28, 1935, with reference to reducing the attendant's expense for Charles. I can appreciate the fact that the burden has been rather heavy on you, and inasmuch as Charles is very much better, instead of reducing Mr. Gillman's expense to half, I believe it would be more satisfactory to make you a flat rate of forty-five ($45) per week, beginning February 2. Then we can use our judgment as to how much time it will be necessary for the attendant to spend with Charles. It will probably be best to have an attendant with him all the time he is out walking, but while he is in the building he can be kept under general supervision, and it will not be necessary for the attendant to be with him every minute. I am pleased to say that Charles is getting along better from a mental standpoint. He has recently had just a little setback of the milder type, but is now on the up-grade, and I have just had the most satisfactory talk with him that I have been able to have since he has been here. He apparently realized for the first time that he has been mentally sick, and is willing to co-operate with us in every way possible to help him work out his situation. I sincerely trust that he will continue to improve and in the next few weeks will be well enough to come home. I regret to say that Mr. Gillman is leaving us to accept a position in Baltimore. However, we have a splendid attendant to take his place, who is getting along very nicely with Charles. I feel sure that he will continue to fill the place satisfactory. I am enclosing a statement of your account up to February 2." There was uncontradicted testimony from two or three witnesses experienced in the treatment of mental cases, that, where the condition of the patient warrants it, it is to his advantage, consistently with his safety, that the supervision and attendance be reduced as much as possible, the effect being to give the patient encouragement and self-assurance. At the time of the injuries sued for, the treatment was proceeding along the line mentioned in the letter from the defendant to the patient's father, the patient occupying a room without bars on the second floor. It was testified by the defendant: "The nurses, doctors, and attendants were going about the second floor. The

third floor is used mainly for nurses and attendants. If a patient were in the building without an attendant, there were others up on the floor constantly."

On February 27 or 28, 1935, the exact date not being clear from the evidence, the plaintiff was in the lobby on the second floor, accompanied by an attendant. During a brief absence of the attendant in a toilet near by, the plaintiff after reaching a landing on the steps from the second floor to the first floor, fell or jumped, while leaning over the banisters or railing, to the first floor, receiving injuries for which he sued. There was no witness to the occurrence. The circumstances were related by the plaintiff as follows: "When I had the fall it was before Dr. Gardner went to the Base Hospital 48. I would say between nine and ten o'clock. I am sure I had had breakfast before I had the fall. . . All of these things [certain facts and circumstances which he said depressed him] along with my being there at the sanitarium caused me to feel very weak physically; and consequently when the attendant went to the bathroom or toilet I was left alone. There wasn't any one there, and I was inclined to end it all before that. I was on the second floor, and I had a tendency to stand on the railing and jump down. Once I had a tendency to jump off of Stone Mountain when the attendant, Dawson Gillman, had left a young man by the name of Charles with me. I had gotten as far from him as from here to the middle of the court-room, to the edge of the precipice, but he was with me and restrained me from doing so, but I had looked around and examined the mountain to jump off. [The plaintiff then detailed certain facts as to supervision and solicitude towards him which he said depressed him.] So it happened when this attendant went to the bathroom one morning after I had breakfast, I felt my mental condition to be nothing at all. I remember running down to the landing between the first and second floors. . . Just before I fell I looked down. . . I didn't feel I would kill myself falling from this first to the second floor. I didn't know. I was dizzy, and I only tried to do as Dr. Gardner said, and I didn't know how to do, being attended all the time like a mere child, and it pressed upon my mind. I did not know what to do, and I felt like hitting something hard to bring me out of this or to bring me from under it; and as I looked over the rail, I do not think I jumped, I think

I leaned over it, and I realized then that I had no more control, that I was probably unconscious, and I fell and hit the first floor. . . I would say it was involuntary; the fact that I should have known better had I been in a normal condition. . . I can not say whether or not I intended to go on down when I leaned over. I do not remember my mental condition at that time. . . This attendant had just stepped into the bathroom; he had gone from the little lobby on the second floor. I didn't know he was going when we came out into the lobby. . . I don't know just how long he had been there, but I did not have any idea of doing such a thing to myself up to the time that he went into the bathroom; and it seemed to me like I halted and looked around to see if there was anybody on the floor downstairs, and Dr. Gardner wasn't around, but there was no one on the floor, and I believe the patients were still locked in their rooms, but it was some time he was in the bathroom, because I had no premeditated idea of that." He testified that on regaining consciousness he reported to Dr. Gardner that his back was broken, and that he had pains in his foot and leg. There was evidence by an X-ray expert that he had received a fracture of the first lumbar vertebra, and there was a small chip from the second lumbar vertebra. There were also certain fractures of the bones of the right foot and of one toe bone.

It was contended that the defendant was negligent in not having X-rays made until March 1, 1935, a day or two after the injuries, and in not having made a certain plaster cast until March 3, 1935. As to that the defendant testified: "When the young man fell I was in my office, looking over my mail, about ten o'clock in the morning. I did not see him when he fell. I heard it and went to him. . . I naturally gave him first aid. . . In the afternoon he had cleared up and was conscious. I examined him to see if he had any bones broken. In the afternoon I did not find anything but the swelling in his right foot. . . Of course, we continued to keep him comfortable, kept him in bed and bandaged up his foot. Early that night we discovered that he was not able to pass water, and I catheterized him and had to use that several days. In the course of two or more days he was all right. I called Dr. William F. Lake, in the Medical Arts Building, who has an X-ray laboratory and supposed to be the finest in the city, for an appointment to have Mr. Stansfield X-rayed, to see whether

or not he had any fractures. He was sent down to Dr. Lake's laboratory, and his lower spine and foot were X-rayed. After getting the X-rays taken I notified his father the extent of the injuries, and explained to him it would be necessary to have an orthopedic surgeon to treat the case from that standpoint. Dr. Thomas Goodwin was called in, and his assistant came out, after obtaining the pictures from Doctors Lake and Ayers, and left instructions for him to be brought to the Georgia Baptist Hospital the next day, so he could be put in a plaster cast necessary for his spine and right foot. He was carried to the Georgia Baptist Hospital. Doctors Goodwin and Jernigan are reliable bone surgeons with office in Atlanta. . . I had about five nurses in my institution when this accident occurred, as well as I recall. That included the attendant, Mr. Gillman. I don't recall the exact number of patients in the institution at that time, but we ordinarily have around fifteen or sixteen, probably eighteen. They were not all mental patients."

1. The contention of the plaintiff is that his injuries were due to the negligence of the defendant in permitting him to go about the institution without an attendant, and in not rendering him prompt attention and service after he fell or jumped, permitting him to lie with a broken back and foot until March 1, 1935, a day or two after his injury, and to remain without prompt attention and without having his body placed in a plaster cast until March 3, 1935. From a careful examination of all the evidence we are of the opinion that a jury question was presented; and that the evidence, though conflicting, was sufficient to authorize the jury to return a verdict in favor of the defendant. The general rule as to the duty owed by a private hospital to a patient is well stated in *Emory University* v. *Shadburn*, 47 *Ga. App.* 643 (171 S. E. 192) : "A private hospital in which patients are placed for treatment by their physicians, and which undertakes to care for the patients and supervise and look after them, is under the duty to exercise such reasonable care in looking after and protecting a patient as the patient's condition, which is known to the hospital through its agents and servants charged with the duty of looking after and supervising the patient, may require. This duty extends to safeguarding and protecting the patient from any known or reasonably apprehended danger from himself which may be due

to his mental incapacity; and to use ordinary and reasonable care to prevent it." A hospital is not, however, an insurer of the patient's safety. Realizing the condition of his son when first admitted to the hospital of the defendant, the father provided by contract for additional supervision. It was agreed that in consideration of a special attendant he would pay an extra charge of $25 per month. After the son had been in the hospital about five months, the father, on January 28, 1935, wrote to the defendant with a view of reducing the expense, consistently with the treatment and attention that the condition of the son required. It is clear from that letter that he reposed full confidence in the defendant, and was authorizing him to provide for the son whatever protection, in addition to that required by the law, his judgment might prescribe, being willing to depart from the original contract in regard to a special attendant at all times, provided that the mental and physical condition of his son justified it, and in order to reduce the expense that he was sustaining. He submits a plan to the defendant, but makes it plain in the beginning of his letter that he does not wish "to be penny wise and pound foolish" and states that "I am leaving it entirely up to your judgment and will abide entirely by what you say." What the defendant said was that the plaintiff was progressing from a mental standpoint, was on the up grade, and was realizing for the first time that he was mentally sick, and was willing to co-operate to accomplish his restoration; that his condition was in fact such that the defendant indulged a hope that he would be able to return home in a few weeks; and because of those things the judgment of the defendant was that the special attendant provided for in the original contract should be eliminated, except when needed to accompany the patient on his walks outside of the building, "general supervision" being employed when the patient was within the building, but that it would not be necessary for the attendant to be with him every minute. It is true that the father stated that the plan proposed was for two-weeks trial, but it was also stated that "after a trial as suggested above, that if he still improves and becomes more and more normal, that we might try dispensing with Mr. Gillman's services and throwing him entirely on his own." But the suggestion is only incidental to the main purpose, and, we think, is overborne by the general authority given to the defendant when

the father says, "I am leaving it entirely up to your judgment and will abide entirely by what you say."

We think that a reasonable construction of the letter is that the father was not requiring a two-weeks trial and a report as to what subsequent procedure might be advisable, but was saying, in effect: "I want to reduce the expense if Charles's condition will permit. I would like to so arrange that I will have to pay only about $12.50 a week for extra supervision [which would make his total cost $47.50 per week], but go ahead and use your own judgment about these matters. I put myself in your hands as to what you think should be done for him in the way of a special attendant, and I do not wish to be penny wise and pound foolish." Instead of accepting the proposed $47.50 per week for total expenses, the judgment of the defendant was that it should be $45 per week, and his judgment as to the supervision of the patient was as above stated. Certainly, under the construction we have placed on this correspondence, the father would be estopped from complaining that, under any special agreement, no attendant was constantly at the side of the patient; and this being true, the son could not complain of any lack of extra supervision. The son would not, however, be deprived of the right to avail himself of the protection otherwise afforded by the law generally as to the care and diligence due to him, as a patient, by the defendant. Thus the case turns on the question whether or not, under the evidence and the law, the defendant is liable. It would make no difference, on the question of liability, whether the fall of the plaintiff was voluntary or involuntary, if his condition, known to the defendant, was such at the time as to require an attendant at the instant of his fall. As to his condition about that time the evidence is in conflict, but the jury was authorized to believe from the testimony of the nurse, the attendants, the defendant, and the general circumstances of the case that such a fall could not reasonably have been apprehended at the time. They were authorized to believe that he had not shown any disposition to destroy himself previously and that he would not attempt to do so on that occasion. The case is distinguishable from the *Shadburn* case which involved a delirious patient, and where this court held that it was a jury question whether or not in her condition her act of jumping out of the window should, in the exercise of proper care on the part of the

hospital authorities, have been anticipated at the time. The plaintiff in the present case testified: "I did not have any idea of doing such a thing to myself at the time that he [the attendant] went into the bathroom." To hold the defendant liable would be to say that, under the degree of care required of the defendant, the attendant, though not provided for incessant attention, should not have left the patient for an instant, even when there was no reason for apprehending, as the jury evidently found, that the patient would throw himself over or fall over the banisters of the stairway. A physician is not liable for an improper diagnosis in all events, but the test is whether or not he has used reasonable care and diligence as a professional man. There was no evidence by experts as to whether or not the defendant was negligent, as claimed, in not detecting that certain bones of the patient's back and right foot were fractured, or in not more promptly providing for an X-ray examination and a plaster cast. The plaintiff testified that he complained to the defendant that his back was broken. The defendant testified that he rendered first aid, made him comfortable, and examined him, but found nothing wrong except a swelling of the right foot, and that the patient was apparently all right in a day or two; that he had an X-ray examination made in Atlanta, notified the father of the patient that an orthopedic surgeon would be required; and that the plaster cast was applied on March 3, 1937. We can not say that, as a matter of law, a finding of negligence was demanded in those respects; and the jury has resolved that question in favor of the defendant.

2. The first special ground of the motion for new trial complains that the court erred in admitting in evidence the correspondence between the plaintiff's father and the defendant, as to a reduction of special supervision; contending that the letters did not constitute a contract. For the reasons given in the first division of this opinion, we think that they were admissible to show the father's acquiescence in the degree of supervision of the patient after February 1, 1935, and that the defendant was not under a duty, as respects any agreement with the father, to constantly provide an attendant for the son. Apart from any special contract, however, it was for the jury to determine whether or not, under the general rule, the condition of the patient, known to the defendant, required that an attendant should have been with the patient at the instant of the fall.

3.   In the second special ground complaint is made of the admission in evidence of certain statements of the defendant that in writing to the plaintiff's father it was his idea to place the patient on more personal responsibility, and to give him encouragement and self-reliance, such practice, where the patient's condition permits, being in line with the best opinion of those who are expert in the treatment of mental diseases; it being contended by the plaintiff that the construction of the correspondence was for the court.   The statement of the defendant did not amount to a construction of the correspondence, and was admissible as showing the reason for making the proposal to reduce the supervision as indicated in the letter of the defendant, and did not contradict any statement in the letter.

4.   The court did not err in refusing to charge the jury, as requested by the plaintiff, that "Proof of an accident to a patient while in the care of a hospital carries with it the presumption of negligence, regardless of whether the injury was caused by carelessness of the owner thereof." An "accident" in its strict sense implies the absence of negligence, for which no one would be liable.   The requested charge, therefore, did not state a correct principle of law.   The ground of the motion that the court refused to charge, as requested, that "If it should appear from the evidence that the capacity of plaintiff to labor and earn money has been permanently diminished by the physical injury in question, and if it should appear from the evidence that said injury was the result of the neglect of the defendant, the plaintiff could recover damages therefor, notwithstanding that there may have been no proof as to what such earnings were before or after the injury; and in this connection the term labor and earn money may include mental labor and occupation," is without merit.   No issue was made as to the earnings of the plaintiff.   The court charged the jury that the plaintiff could recover in the event they found the defendant negligent, and did not make recovery dependent on the plaintiff having earned any money.   Consequently the plaintiff can not be said to have been harmed.   Error is assigned on the refusal of the court to charge, as requested, "that the fact that some one other than the patient pays the hospital expenses will not relieve the hospital from liability, provided the evidence shows that otherwise the hospital would be liable.".   No issue was

made by the pleadings or the evidence in this respect. The charge of the court fully instructed the jury as to the liability of the defendant in the event the evidence showed a failure on his part to exercise the degree of care required by law towards the plaintiff, and did not limit recovery to circumstances under which the plaintiff himself pays the expenses. The plaintiff can not be said to have been harmed in the particular named.

5. Another ground complains of the failure of the court, without a request, to charge as to the specific allegation of negligence of the defendant in not rendering prompt service and attention to the plaintiff, and in permitting him to lie with a broken back from the date of the injury until March 1, 1935, without making any effort to ascertain the nature and extent of the injuries; it being contended that such was a substantial and material issue in the case. The issue in the present case was whether or not the defendant was negligent in certain respects. The record shows that the court fully instructed the jury on the law as to the duty of the defendant, and properly defined negligence. In the judge's charge he stated, which is not denied by the plaintiff in error, that counsel had submitted to them all of the substantial issues; and while the judge did not refer to the specific item of negligence above mentioned, he stated that he did not mean by what he had said elsewhere to limit the contentions of the plaintiff, and that they were referred to in detail in the pleadings which they would have out with them, and the jury could refer to them to see specifically what was set forth, "the particulars in which he charges that the defendant and the defendant's agents were negligent." As was held in *Livingston* v. *Taylor,* 132 *Ga.* 1 (63 S. E. 694), "In the summary of the plaintiff's contentions as made in the petition, the court should not omit any substantial issue of the plaintiff's case which finds support in the evidence; but a failure in this regard will not result in a new trial, where it appears that the court, in the charge as a whole, so presented the law in its application to the omitted issues as to warrant a reasonable inference that the jury understood the plaintiff's full contentions." We think a reasonable inference is warranted that the jury in the present case understood the plaintiff's full contentions. Moreover, there was no special request to charge; and this should have been made if the plaintiff desired specific instructions in addition to the general charge.

6. What is said above applies equally to the contention of the plaintiff as to the allegation with respect to the alleged failure of the defendant to place the plaintiff's body in a plaster cast until March 3, 1935.

7. Another ground complains of a portion of the charge in which the court stated that if the jury believed "the people who had charge of the plaintiff under the care of Dr. Gardner was the agent of Dr. Gardner," etc., it being contended that the evidence raised no issue of agency, and that the expression "was the agent" was misleading to the jury, that the attendants were in fact "employees," and the jury was thereby called on to determine an issue not raised by the pleadings. Without entering into any discussion as to the possible distinction between an "agent" and an "employee," it is sufficient to say that the jury, under the full charge of the court, could not reasonably be said to have been confused or required to enter upon an inquiry not necessary in determining the liability, if any, of the defendant because of the alleged negligence of any of the attendants, nurses, or others engaged in the service of the defendant.

8. Another ground complains, in effect, that without request the court should have instructed the jury that they might apply the doctrine of res ipsa loquitur. Such a doctrine is not applicable where the causal facts of the injury are known and testified to. The mere fact of injury does not call for the application of the doctrine. In the present case it was alleged and proved that the fall of the plaintiff, whether voluntary or involuntary, was the immediate cause of the injury. All the facts were shown by the evidence. The inquiry of the jury was whether or not the plaintiff made out a case of negligence against the defendant under his obligation to properly care for and protect the patient against the occurrence.

9. Another ground complains that the court erred in stating to the jury that "the defendant alleges and contends that the plaintiff had improved to such an extent that in his opinion he was capable to go about the building alone." While the defendant did not so allege in his answer, he testified, without objection, to that effect, as against the contention of the plaintiff; and as this was thus made an issue on the trial of the case, we do not think that the plaintiff can be said to have been harmed.

10. Another ground complains that the court erred in charging the jury: "A person operating a private hospital is not an insurer of his patients against injury inflicted by themselves, but is only required to use ordinary care and diligence in the treatment and care of the patient." The charge stated a correct principle of law, and was pertinent in view of the fact that under the evidence the jury would have been authorized to find that the plaintiff jumped over the banisters of the stairway. It could not reasonably be interpreted, as urged by the plaintiff in error, as causing the jury to understand that the liability of the defendant was restricted "to injuries other than those inflicted upon the patients by themselves." The court did not err in overruling the motion for new trial.

*Judgment affirmed. Stephens, P. J., concurs. Felton, J., dissents.*

FELTON, J., dissenting. I think that the admission in evidence of the correspondence between the plaintiff's father and the doctor was exceedingly prejudicial to the plaintiff. The defendant's answer contained the following allegation: "Further answering, the defendant shows that in the latter part of January, 1935, plaintiff's father requested the defendant to dispense with a special attendant for the plaintiff, and it was agreed between plaintiff's father and the defendant that defendant would not furnish plaintiff with a special attendant at all times, but would only furnish an attendant for plaintiff when plaintiff was out of the hospital building taking his exercise and walks, etc." At the time this correspondence was introduced in evidence, to support the above allegations in the answer, the defendant's counsel stated to the jury: "That is a letter relating to an agreement. Paragraph five in the answer there states that was an agreement. You can make an agreement by letter." The letter from the plaintiff's father to the doctor suggested dispensing with the special attendant at certain times, to save money, if in the doctor's judgment it was wise. The arrangement suggested was not agreed on or adopted. On the contrary the doctor continued to furnish the attendant for a reduced consideration, and undertook to be guided by his best judgment, as he was bound to do from the beginning. The negotiations by correspondence, looking to a reduction of expenses, had nothing to do with the case, and might have easily

confused the jury in inclining them to believe that the father had agreed to dispense with the attendant's care inside of the building. I think the evidence was very prejudicial and confusing, and that a new trial should be granted on account of its admission in evidence. I am of the opinion that the judge erred in charging the jury that if they believed the people who had charge of the plaintiff were the agents of the defendant, and were negligent, the defendant would be liable, because there was no dispute about the fact that the attendant was the defendant's agent; and because the charge was confusing, possibly authorizing the jury to find that the attendant was the agent of the plaintiff or his father. I do not interpret this exception to be based on any distinction between the meanings of the words "agents" and "employees." I do not concur in all that is said in division 8 of the majority opinion.