**Louis F. BORNMANN et al., Plaintiffs-Appellants,**

v.

**GREAT SOUTHWEST GENERAL HOSPITAL, INCORPORATED, et al., Defendants-Appellees.**

No. 71–1848
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Dec. 29, 1971.

* ■ Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I.

James S. Vecchio, Vecchio & Vecchio, Arlington, Tex., for plaintiffs-appellants.

L. W. Anderson, Dallas, Tex., for defendants-appellees.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

This is a diversity action brought by Louis F. Bornmann, individually and on behalf of his two minor daughters, for the death of his wife, Nancy C. Bornmann, from a self-administered dose of barbiturate drugs while she was a patient at Great Southwest General Hospital, Inc. in Grand Prairie, Texas. Bornmann appeals from a jury verdict in favor of the defendants: Great Southwest General; the attending physician, Dr. Nancy Amil, deceased; and her partner, Dr. Virginia King, individually and as executrix of Dr. Amil's estate. The plaintiffs-appellants question the propriety of certain jury instructions as well as various rulings by the trial judge during the course of the trial. We affirm.

At 6:30 p. m. on June 11, 1968, Nancy Bornmann, was admitted to Great Southwest General Hospital as a paying patient. The hospital records indicate that the admitting diagnosis was "Possible phenobarbital or dilantin reaction" and that Mrs. Bornmann's physician was Dr. Nancy Amil. Nancy Bornmann was a registered nurse and had been employed as a nurse at Great Southwest General Hospital for seven months. Counsel fully explored Mrs. Bornmann's medical history at the trial. She had experienced four or five grand mal seizures beginning in 1952 and was considered to be an epileptic. To control seizures, she took phenobarbital and dilantin. Mrs.

Bornmann was known to have difficulty with drugs, having been sent home from her work as a nurse at least twice by the hospital administrator and by her fellow nurses for inability to perform her duties because of the influence of drugs. Earlier, she had been admitted as a patient to Great Southwest on May 12, 1968; the admitting diagnosis was: "Dilantin overdosage. Cerebrovascular spastic action of Orthonovum".

At 7:30 a. m. on June 14, 1968, hospital attendants found Nancy Bornmann dead in her hospital room. The death certificate listed the cause of death as "Barbiturate poisoning"; an autopsy report stated that the cause of death was "Phenobarbital Intoxication". Testimony disclosed that Mrs. Bornmann's stomach contained "no less than 300 . . . pills" which laboratory test revealed to be phenobarbital. The source of the drugs she ingested was not determined. At 4:00 p. m. on June 13, 1968, her vital signs were last charted. Her husband visited her the night before her death and remained with her until about 9:30 p. m. He testified that his wife was in good spirits and that he had observed no indications of potential suicide.

This diversity suit is controlled by Texas law. The defendants assert the following defenses: (1) contributory negligence, (2) lack of foreseeability, (3) new and independent cause, (4) "volenti non fit injuria", and (5) unavoidable accident. The trial judge presented the jury with eleven special issues. The jury found the hospital negligent in caring for Nancy Bornmann but found that the hospital's negligence was not a proximate cause of her death.[1] Furthermore,

1. SPECIAL ISSUE NO. I:
   Do you find from a preponderance of the evidence that on the occasion in question Great Southwest General Hospital, Incorporated, was guilty of negligence, as that term has been defined herein, in attending to and caring for Nancy Bornmann while she was a patient in the hospital?
   Answer "YES" or "NO".
   Answer: Yes
   If you have answered the foregoing Special Issue "YES", and only in that

event, you will answer the following Special Issue; otherwise, you need not answer.
SPECIAL ISSUE NO. 2:
   Do you find from a preponderance of the evidence that the negligence, if any, on the part of Great Southwest General Hospital, Incorporated, in the respects inquired about in the foregoing Special Issue was a proximate cause of the death of Nancy Bornmann?
   Answer "YES" or "NO."
   Answer: NO

the jury found Nancy Bornmann negligent in one or more respects and that her negligence was a proximate cause of her death.[2]  Also, the jury found that Nancy Bornmann understood the extent of danger presented by taking an overdose of barbiturates and that she voluntarily exposed herself to such appreciated danger as a result of intelligent choice.[3]  The jury exonerated Dr. Nancy Amil and

The trial judge defined "Negligence" as follows:

"NEGLIGENCE", as applied to the Great Southwest General Hospital, Incorporated, means a failure, if any, on the part of the authorized agents and employees of such hospital to use that degree of care and skill ordinarily used by a hospital of the same general type in the same or a similar community in which such hospital is located at the time in question under the same or similar circumstances.

The trial judge defined "Proximate cause" as follows:

"PROXIMATE CAUSE", as applied to the Great Southwest General Hospital, Incorporated, means that cause which in a natural and continuous sequence unbroken by any new and independent cause produces an event and without which cause such an event would not have occurred and in order to be the proximate cause the act or omission complained of must be such as the authorized agents or employees of a hospital of the same general type in the same or a similar community at the time in question using ordinary care would have foreseen that the event or some similar event might reasonably result therefrom. There may be more than one proximate cause of an event.

The trial judge defined "New and Independent Cause" as follows:

"NEW AND INDEPENDENT CAUSE" means the act or omission of a separate or independent agency, not reasonably foreseeable, which destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such an occurrence.

2. *SPECIAL ISSUE NO. 7:*
Do you find from a preponderance of the evidence that on the occasion in question NANCY C. BORNMANN was guilty of negligence in any one or more of the following respects:  in failing to obey the order of her physician not to take any barbiturates, if there was such an order;  or in taking an overdose of barbiturates;  or in failing to warn defendant hospital, its agents or employees that she had taken barbiturates;  or that she had barbiturates in her possession at the time of admission to the hospital; or in failing to request an antidote or special treatment for an overdose of barbiturates, or in failure to self-induce vomiting after taking an overdose of barbiturates?

Answer "YES" or "NO".
Answer: YES

If you have answered the foregoing Special Issue "YES", and only in that event, you will answer the following Special Issue; otherwise, you need not answer.

*SPECIAL ISSUE NO. 8:*
Do you find from a preponderance of the evidence that such negligence, if any, on the part of Nancy Bornmann in any one or more of the respects inquired about in the foregoing Special Issue was a proximate cause of the death of Nancy C. Bornmann?

Answer "YES" or "NO".
Answer: YES

As applicable to Nancy Bornmann, the trial judge defined "negligence" and "proximate cause" as follows:

"NEGLIGENCE", as applied to Nancy C. Bornmann, means a failure to do that which a reasonably prudent person of the same or similar training and experience would have done under the same or similar circumstances or doing that which a reasonably prudent person with the same or similar training and experience would not have done under the same or similar circumstances.

"PROXIMATE CAUSE", as applied to Nancy C. Bornmann, means that cause which in a natural and continuous sequence produces an event and without which cause such event would not have occurred and in order to be a proximate cause the act or omission complained of must be such that a person of the same or similar training and experience would have foreseen that the event or some similar event might reasonably result therefrom.  There may be more than one proximate cause of an event.

3. *SPECIAL ISSUE NO. 9:*
Do you find from a preponderance of the evidence that Nancy C. Bornmann actually appreciated the extent of danger presented by taking an overdose of barbiturates?

Answer "SHE DID ACTUALLY APPRECIATE THE DANGER." or "SHE DID NOT ACTUALLY APPRECIATE THE DANGER".

Louis F. Bornmann of any negligence. The court denied a motion for a new trial.

### I. Alleged Errors in Jury Instructions

A. *Instructions on Negligence.* The Bornmanns contend, first, that the trial court erred in charging the jury and submitting special issues to the jury inquiring whether Nancy Bornmann was negligent in certain respects and if her negligence was a proximate cause of her death, because the instructions (See footnote 2) invited and permitted the jury to find that her suicide was contributory negligence. They argue that the hospital was under a specific duty to care for Nancy Bornmann and to prevent acts such as suicide. If suicide may be considered contributory negligence, they contend, the hospital would be relieved of liability and the specific duty of care would evaporate because of the occurrence of the very act to be guarded against.

■ We note at the outset that the charge to the jury accurately represented to the jury the applicable Texas law. Simply stated, a hospital is under a duty to exercise reasonable care to safeguard the patient from any known or reasonably apprehensible danger from himself and to exercise such reasonable care for his safety as his mental and physical condition, if known, may require. Liability exists only if the suicide proximately results from the negligence of the hospital or its employees. The most important single factor in determining the liability of a hospital for failing to prevent the suicide of a patient is whether the hospital authorities in the circumstances, could reasonably have anticipated that the patient might harm himself. See Anno., Civil Liability for Death by Suicide, 11 A.L.R.2d 751 and cases cited therein; 40 Am.Jur.2d 849; Arlington Heights Sanitarium v. Deaderick, 272 S.W. 497 (Tex.Civ.App.1925). The trial court's charge accurately stated the law.[4]

■ The appellants' argument as to the propriety of the submission of Special Issues 7 and 8 with accompanying definitions (See footnote 2) may be taken as questioning the relevance of contributory negligence to a hospital—suicide case. In effect, the appellants argue that contributory negligence is not a defense to a cause of action based on the alleged negligence of a hospital, because

Answer: She did actually appreciate the danger.
If you have answered the foregoing Special Issue "SHE DID ACTUALLY APPRECIATE THE DANGER" then, and only in that event, answer the following Special Issue:
SPECIAL ISSUE NO. 10:
Do you find from a preponderance of the evidence that Nancy C. Bornmann voluntarily exposed herself to such appreciated danger, if any, as a result of intelligent choice?
Answer "YES" or "NO".
Answer: YES.

4. The trial judge stated:
You are instructed that a hospital is responsible for the negligent act or negligent omission of its agents and employees. If you find from the evidence that the proximate cause of the injury to the plaintiffs was the negligence of the agents and employees of the defendant hospital, as negligence is defined in these instructions, such acts or omissions are, in law, acts or omissions of the hospital and the hospital is charged with the legal consequences thereof.
You are instructed that a hospital which undertakes to care for a paying patient, and to supervise and look after him, is under a duty to use that degree of care and skill ordinarily used by a hospital of the same general type in the same or a similar community in which such hospital is located at the time in question under the same or similar circumstances, in caring for and attending the patient as the patient's condition, as it is known to be, may require. You are instructed that this duty extends to safeguarding and protecting the patient from any known or reasonably apparent danger from himself, which may arise from his known mental or physical incapacity, and the hospital is further charged with the duty of using such care to prevent any injury resulting from such known mental or physical incapacity, if any there is.

contributory negligence cannot preclude liability when a specific duty of care exists. Assuming, but not deciding, that contributory negligence may not serve as a defense to a suit for violation of a hospital's specific duty of care, the argument advanced by the appellants is not applicable to the instant case. The jury was not expressly instructed on the doctrine of contributory negligence nor do any of the Special Issues in terms raise that defense. Assuming, however, that Special Issues 7 and 8 (See footnote 2) may be read as raising the defense of contributory negligence, their presence in the jury instruction was harmless in this case. The jury absolved Great Southwest of liability by its answers to Special Issues 1 and 2 (See footnote 1). By finding that the hospital was negligent but that the negligence was not the proximate cause of Nancy Bornmann's death, the jury freed the hospital from liability. The issue of contributory negligence was therefore immaterial. We would be faced with a different situation if the jury had found Great Southwest negligent and its negligence a proximate cause or if the jury had found Nancy Bornmann negligent and her negligence a proximate cause, and, therefore, a verdict had been entered in favor of the defendants because of contributory negli-

gence. In such a case, the appellants' contentions as to the inapplicability of contributory negligence would have been relevant.[5] Here, however, the jury absolved the hospital of liability by its finding as to lack of proximate causation. Contributory negligence was, therefore, irrelevant. See FRCP 61.

In addition to launching a frontal attack on the contributory negligence defense, the appellants mount a collateral attack. On appeal they question the effect which the submission of Special Issues 7 and 8 had on the jury's decision on Special Issue 2 (See footnote 1). The jury may, according to appellants, have considered Nancy Bornmann's negligence as a "new and independent cause" and found Great Southwest's negligence not to be a proximate cause of Mrs. Bornmann's death because of the intervention of a "new and independent cause". Thus, the jury verdict, even if not directly traceable to the use of the contributory negligence doctrine was influenced by its interjection into the case. The answer to Special Issue 2, the appellants contend, was motivated by a desire to absolve the hospital of guilt for the suicide which the jury felt was a negligent act on the part of Mrs. Bornmann.

Assuming, but not deciding, that the suicide may not constitute a "new and in-

5. We have difficulty with the appellants' argument as to the inapplicability of the doctrine of contributory negligence even if we were to concede its relevance to the instant appeal. Most of the cases cited by appellants as excluding the defense involved patients with known suicidal tendencies, hospitals which had specifically undertaken to prevent self-inflicted injury, or situations where the litigants had not questioned the inapplicability of the defense. The cases may be read as excluding the defense of contributory negligence, *if at all*, only when the defendant is on notice of the suicidal danger or has specifically undertaken a duty to prevent suicide. The jury could reasonably have concluded that the case at bar was not such a situation. *See* Anno., 11 A.L.R.2d 751 and cases cited therein; see also (cited by appellant). Edwards v. Grace Hospital Soc. (1944) 130 Conn. 568, 36 A.2d 273; Stansfield v. Gardner (1937) 56 Ga.App. 634, 193 S.E. 375; Breeze v. St. Louis & S. F. R. Co. (1915) 264 Mo. 258, 174 S.W. 409; Davis v. Springfield Hospital (1917) Mo. App. 196 S.W. 104; Pangle v. Appalachian Hall (1925) 190 N.C. 833, 131 S.E. 42; Meehan v. United States (D.C.N.Y.) 180 F.Supp. 171 (1959); Frederic v. United States (D.C.E.D.La.) 246 F.Supp. 368 (1965); Hirsh v. State, 8 N.Y.2d 125, 202 N.Y.S.2d 296, 168 N.E.2d 372. Wood v. Samaritan Institution, 26 Cal. 2d 847, 161 P.2d 556 (1945); Richardson v. Dumas, 106 Miss. 664, 64 So. 459 (1914); Smith v. Simpson, 221 Mo.App. 550, 288 S.W. 69 (1926); Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228 (1932) and (cited by appellee) DeMartini v. Alexander Sanitarium, 192 Cal. App.2d 442, 13 Cal.Rptr. 564 (1961); Vistica v. Presbyterian Hospital & Medical Center, 67 Cal.2d 465, 62 Cal.Rptr. 577, 432 P.2d 193 (1967), and Hunt v. King County, 4 Wash.App. 14, 481 P.2d 593.

dependent cause" breaking the chain of proximate causation (a point dealt with more fully below), we do not agree that the jury acted as the appellants would like us to believe. Proximate causation, as defined by the trial court, (See footnote 1) consisted, in this case, of two distinct elements: (A) New and independent cause *and* (B) Foreseeability. In order for the plaintiffs to recover, the jury would have had to find no "new and independent cause" (not A) and foreseeability (B). Inherent in the definition of "new and independent cause" (See footnote 1) was lack of foreseeability. For the jury to have erred as the appellants contend, the jury must have found that the suicide was foreseeable (B) but that there was a "new and independent cause" (A).[6] This would mean that the jury found suicide foreseeable (as part of its consideration of the foreseeability component of proximate cause) and, at the same time, not foreseeable (as part of its consideration of the "new and independent cause" component of proximate cause). We cannot attribute this obviously contradictory finding to the jury, especially in view of the clear and complete instructions.

Although we cannot probe the minds of the jurors, it is fair to say that the jury found lack of foreseeability (not B) and no "new and independent cause" (not A) or lack of foreseeability (not B) and a "new and independent cause" (A).[7] The appellants' contention as to the influence which the submission of Special Issues 7

and 8 had on Special Issue 2 is without merit.

■ Next, the Bornmanns argue that it was error for the trial court to submit Special Issue 7 (See footnote 2) on the negligence of Nancy Bornmann because there was insufficient evidence to support the issue. We can not agree. Nancy Bornmann was a "Registered Nurse" with all the training and experience inherent in that title. She was familiar with general hospital procedure as well as methods for the treatment of patients. Her own experience with drugs surely had alerted her to the proper use of drugs and the dangers of improper use. There was testimony as to curative measures employed in the case of drug overdose, measures with which Nancy Bornmann was familiar. There was substantial evidence therefore upon which the jury might reasonably have based a finding of negligence for one or more of the reasons listed in Special Issue 7. The submission of this issue was not erroneous.

■ B. *Instructions on "New and Independent Cause"*. The appellants complain of the trial court's definition of "new and independent cause" (See footnote 1) on the ground that it misled the jury into believing that suicide may constitute a "new and independent cause" relieving the hospital of liability no matter how negligent the hospital may have been in the care and treatment of the deceased patient. First, the trial court's

---

6. They clearly did not find foreseeability (B) and no "new and independent cause" (not A), or they would have given an affirmative answer to Special Issue 2. A finding of lack of foreseeability (not B) and no "new and independent cause" (not A) or lack of foreseeability (not B) and a "new and independent cause" (A) would not give appellants grounds to complain as the finding, in either option, of lack of foreseeability (not B) would prevent recovery without reference to the "new and independent cause" issue.

7. A finding of lack of foreseeability (not B) and a "new and independent cause" (A) involves no contradiction. It amounts to a finding that suicide was not fore-

seeable (not B) *and* that suicide was not foreseeable and, therefore, could serve as a "new and independent cause". A finding of lack of foreseeability (not B) and no "new and independent cause (not A), on the other hand, does involve a contradiction. It amounts to a finding that suicide was not foreseeable (not B) *and* that it was foreseeable and, therefore, could not serve as a "new and independent cause". This contradiction, however, would not give appellants grounds for complaint. The finding of lack of foreseeability (not B) *would*, in itself, preclude liability on the proximate cause issue, independent of the finding on the "new and independent cause" component of proximate cause.

definition of "new and independent cause" was correct. The appellants' suggested addition to the definition was repetitive and, therefore, superfluous.[8] Second, suicide may constitute a "new and independent cause" in certain situations (See footnote 5). See generally Anno., 11 A.L.R.2d 751; Scott v. Greenville Pharmacy, 212 S.C. 485, 48 S.E.2d 324 (1948); Cauverien v. DeMetz, 20 Misc.2d 144, 188 N.Y.S.2d 627 (1959); Appling v. Jones, 115 Ga.App. 301, 154 S.E.2d 406 (1967); Fernandez v. Baruch, 52 N.J. 127, 244 A.2d 109 (1968). The cases disapproving suicide as a "new and independent cause" generally involve situations where the defendant knows of the suicidal risk or has undertaken a specific duty to prevent suicide. The jury might reasonably have found that suicide constituted a "new and independent cause" in the case at bar. Third, Texas law is clear that it is not reversible error to include unnecessarily a definition of "new and independent cause" in the charge. The burden is on the appellant to demonstrate that the alleged erroneous inclusion of the definition reasonably and probably caused the rendition of an improper verdict. See North Texas Producers Assoc. v. Stringer, 346 S.W.2d 500 (Tex.Civ.App.1971); McCord v. Vilbig Construction Co., 417 S.W.2d 634 (Tex.Civ.App.1967). In the instant case no such demonstration has been made. Finally, the jury may never have reached the "new and independent cause" component of proximate cause because of a negative finding on the foreseeability component of proximate cause (See footnotes 6 and 7).

C. *Instructions on "Volenti Non Fit Injuria"*. Next, the appellants complain of the submission to the jury of Special Issues 9 and 10 (See footnote 3) embodying the doctrine of "volenti non fit injuria", because (1) the doctrine was inapplicable to the facts of the case and (2) the doctrine was not supported by sufficient evidence. "Volenti non fit injuria" is an affirmative defense relieving the defendant of liability for negligence when the plaintiff knew of the existence of danger caused by the defendant's negligence and voluntarily and intelligently exposed himself to that danger. See Rabb v. Coleman, 469 S.W.2d 384 (Tex.S.Ct.1971) Halepeska v. Callihan Interest, Inc., 371 S.W.2d 368 (Tex. S.Ct.1963); Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172 (1951); Azores v. Samson, 434 S.W.2d 401 (Tex. Civ.App.1968); Charrin v. Methodist Hospital, 432 S.W.2d 572 (Tex.Civ.App. 1968); Kronzer, "Special Issue Submission in Causes Involving 'Premise Defects' and Volenti Non Fit Injuria", 2 Houston L.Rev. 1 (1964).[9]

The doctrine fits the facts of this case, and there was sufficient evidence to support its submission. The jury might reasonably conclude that a registered nurse trained to handle drugs, who had used drugs herself, appreciated the danger of taking an overdose of barbiturates. There was testimony that Nancy Bornmann was in good spirits the evening of her death and showed no indications of potential suicide. Although there was contradictory testimony, the jury might reasonably conclude that

---

8. The appellants suggested the addition of the following language:
   This agency must not be set in motion by the party who initiated the original act and such agency and its consequences must be such that they could not have been reasonably foreseen (Appx. 390).

9. The doctrine has been used primarily in cases involving injuries caused by defective premises, but we cannot conclude, from a study of the cases, that the Texas courts would refuse to apply the doctrine to the instant fact pattern. The

most recent treatment of the defense of "volenti non fit injuria" by a Texas court is Rabb v. Coleman, 469 S.W.2d 384 (Tex.S.Ct.1971). Although the Court qualified its general statement (see 469 S.W.2d at 387 fn. 1), the Court said:
   Volenti is an affirmative defense to *any* negligence action in which the defendant is responsible for a dangerous condition (static or non-static) or activity of which the plaintiff knows, appreciates the danger and voluntarily exposes himself thereto. (emphasis supplied)

Nancy Bornmann voluntarily exposed herself to the appreciated danger as a result of intelligent choice.

 Assuming, however, that the use of the "volenti" defense was error, it was harmless. The jury by its answers to Special Issues 1 and 2 (See footnote 1), absolved the hospital of primary liability. Therefore, the affirmative defense of "volenti non fit injuria" was immaterial and its inclusion in the charge, even if error was harmless. See F.R.Civ.P. 61.

## II. Other Alleged Errors

The Bornmanns complain of two other actions of the trial judge. First, they contend that the trial court erred by excluding the testimony of one of their expert medical witnesses because his identity was not revealed to the defendants as required by a pre-trial order. The exclusion of the testimony, which may in fact have been merely cumulative, was within the sound discretion of the trial judge as interpreter of the pretrial order. The admission of the testimony may have resulted in unfair surprise to the defendants. Further, the plaintiffs could have called the expert medical witnesses they had identified as required by the pre-trial order. The trial court's ruling admitting the testimony of certain of the defendants' witnesses was not inconsistent with his ruling as to the plaintiffs' witnesses. The defendants' witnesses on hospital administration were not asked to render opinions and, thus, could properly be found by the trial judge not to come within the scope of the pre-trial order. We cannot say that the trial judge's action was an abuse of his discretion. Any error involved was harmless. F.R. Civ.P. 61.

Finally, appellants complain of the trial court's ruling admitting evidence of Dr. Nancy Amil's general standing and reputation in the community because such evidence was allegedly collateral to the issues of the case and highly prejudicial to the appellants' case. Dr.

Amil died before the trial. Dr. King was joined as Dr. Amil's executrix as well as her partner. Dr. Amil was not present at the trial to defend herself. Certain evidence the Bornmanns presented at the trial may be interpreted as bringing Dr. Amil's general abilities and reputation in issue. The testimony to which they object was not likely to prejudice the case in the eyes of the jury. The trial judge did not abuse his discretion in allowing the testimony. Any error was harmless. F.R.Civ.P. 61.

Affirmed.