### 36318. OSBURN v. PILGRIM.

UNDERCOFLER, Chief Justice.

This is a personal injury case arising from the crash of a Cessna 310 private airplane. The plaintiff was stipulated to be a guest passenger. The pilot and owner of the airplane was killed in the crash. Suit was brought against his estate. The jury returned a verdict for the defendant. The Court of Appeals reversed.[1] It held that the trial court erred in charging the jury on assumption of risk and avoidance of consequences. We granted certiorari.

The evidence shows as follows: A Cessna 310 is a two-engine light private airplane equipped with dual controls. Here the airplane was equipped also with instruments and radios for instrument flying. This additional equipment is typical for this type plane and normally adequate for instrument flying. The decedent was an experienced pilot with 5,000 hours of flying time, was licensed to fly two engine aircraft, and was licensed to fly instruments. He invited the plaintiff to accompany him on January 20, 1972, on an instrument flight from Fulton County, Georgia Airport to Ft. Myers, Florida, and return. The plaintiff had been licensed in 1967 or 1968 to fly single engine aircraft and had 400 hours of flying time. He was not licensed to fly instruments but had attended a ten day instrument ground school in Texas during December, 1971, where he failed to pass the final exam.

The flight to Ft. Myers was uneventful. The plaintiff and defendant left Ft. Myers about 4:00 p.m. for the return trip to Atlanta. Prior to leaving Ft. Myers the decedent obtained the necessary instrument flying clearances, properly fueled the airplane, and properly pre-flighted it. It was estimated the flight to Atlanta would take 2 hours and 55 minutes. There is no contention of airplane or airplane equipment failure in this case. The flight from Ft. Myers to the vicinity of Atlanta about 6:30 p.m. was without incident. However, the Atlanta area was described as "socked in" and the flying was totally on instruments. The Atlanta Approach Control "vectored" the airplane to the Very High Frequency Omni Range (VOR) of the Fulton County Airport and it was "handed off" to Fulton County tower for an instrument landing.

The VOR instrument landing system at the Fulton County Airport on January 20, 1972, consisted of a radio beam termed a "radial" extending westerly at 275 degrees. It is received by the airplane's radio and the direction to the VOR station displayed by a needle and dial. Thus the pilot can direct the airplane to the airport.

---

[1] *Pilgrim v. Osburn,* 154 Ga. App. 150 (267 SE2d 776) (1980).

In this case the airplane was proceeding west to east along the radial on a heading of 95 degrees. A VOR system is directional only. It does not indicate the altitude of the airplane. Altitude must be monitored by the pilot from the airplane's altimeter and radio signals from fixed transmitters situated along the path of the VOR radial. These fixed transmitters are called "fan markers." They transmit a radio signal which intersects the VOR radial. The distance of the fan markers from the VOR station is recorded on a chart called an "approach plate" which is published for each airport having instrument landing facilities. When an airplane is proceeding along a radial and crosses a fan marker the signal is received in the airplane in Morse code both audibly and by a flashing light. The pilot can then refer to the approach plate and determine within reasonable limits what distance he is from the airport. More importantly the approach plate specifies what altitude must be maintained at this point.

The Fulton County Airport had three fan markers: Wade 7.9 miles from the airport, Margaret 6 miles, and Terry 2.1 miles. Each visual signal was by a different colored light with Terry being white. The minimum altitude was Wade 3000' MSL, Margaret 2500' MSL, and Terry 1520' MSL. The minimum descent altitude was 1380' MSL. The elevation of Fulton County Airport is 840' MSL. Thus there is a minimum ground clearance of 540'. On the night of this crash, the "ceiling" (base of the overcast) was reported as approximately 1200', although one pilot who landed shortly before this crash estimated the ceiling to the west as low as 600'. Visibility was 2 1/2 to 3 miles. Location along the radial may also be determined within reasonable limits by using a second radio, with which this Cessna 310 was equipped, to record an intersecting signal from another station; in the case of Fulton County Airport, generally from Atlanta airport to the south or Lost Mountain beacon to the north.

The airplane here contacted Fulton County Tower at 6:45 p.m. and reported it had just passed Wade. The tower replied stating the wind direction and velocity, the altimeter setting, and the runway on which to land. It also requested that the airplane's landing lights be kept on. The airplane acknowledged these instructions had been received. There were no further communications from the airplane despite the tower's repeated attempts to contact it by radio. The airplane was found to have crashed 2.8 miles from the airport and approximately one-half mile south of the VOR radial. The point of the crash was 1045' MSL or approximately 200' higher elevation than the Fulton County Airport.

The plaintiff testified: "Q. Okay. What time did y'all take off from Ft. Myers? A. I'd have to check the record. I think it was 4:08. Q. Do you recall the flight up from Ft. Myers? A. Very much so. Q. All

right, if you would, describe it for the jury, the flight coming up. A. Okay, we was coming back to Atlanta, and until we got into the Albany or Columbus area — I think we was probably flying from the south, you know, coming in this way — didn't notice anything unusual until we got into about Columbus or Albany. Then we hit completely socked in weather. In other words, you couldn't see that microphone. From, say, Columbus, Georgia, to the time we crashed we never saw the ground or saw any lights anymore. Q. All right, did you assist Mr. Howard at all in the flight coming in? A. All the way down and all the way back. Pilots have a — a thing a little bigger than this Bible that you strap on your leg. It has a strap that goes under. And I kept the radio. You know, they'll give you a number you got to call. And the one that you had before, in case there's numbers out, you know there's frequencies out, you refer back to it. So, on my right leg I kept all of his radio frequencies down. And every time that they'd assign us a new heading we had to write that down, you see, because, if something's wrong, then you got to know what to refer back to, see. So, I did all of that all the way down there and back. And, also, about the Columbus area we were on the Atlanta Center, which is the area that handles it out that far, the radio. They gave us — you know, gave us the altitudes, and they gave him the altimeter setting.

"Meantime, Mr. Howard asked me, said, 'Get my book and turn to Fulton County and get me the approach plate.' And, again it's a book about this size, but you can take the leafs out. So, I unsnapped it and took the page for Fulton County, which is the approach that you saw this gentleman have, or a copy of it. Q. All right, let me just for clarification hand you what has been marked as D-1. Is that the page you took out? A. Let me get my glasses. I'm getting old. Yes, this is Atlanta, Georgia, Fulton County. Q. All right. Now, this—this leg board that you talked about having strapped to your leg. Where did you get that? A. It was Mr. Howard's. He carried it in his plane. Q. Okay. A. I had it strapped to my right leg. You know, it's kind of like a little blackboard. You know, a little blackboard. But it has paper in it, you know, you flip. Then I was holding this approach plate on my left leg, facing Mr. Howard where all he had to do is look down, see, to get his — you know, the right altitude or the right heading and everything it was going to take to make this landing, see. Q. Okay. A. I had that in my left hand, and I was doing the other with my right. Q. Okay, do you recall anything else about the approach? A. Well, we were on Atlanta Radar, and when we got there they let us down from 8,000 to 3,000 feet. And at that time they told us to call Fulton County, which we did. And then they cleared us for landing. We was on final approach. Q. All right. During the time, now, from Columbus up to—During the time you entered—You said you entered some

obscuration somewhere, Columbus or Albany, in that area? A. Yes, sir. Q. From the time you entered into it until the time that you entered your approach did you see the ground at any time? A. Never saw the ground or any light at any time. Q. Okay, Now, describe, if you will, from the time you entered the approach to the time of the crash, what you recall. A. Well, we was just completely socked in. And, if you've ever been in airplane, as far as you can see is your windshield. And like I say we was following through the procedure of taking the headings that they assigned us and the altitudes. They'd drop us down from eight to six, to six to five, and down to 3,000 feet. And that's the one we maintained until we were, you know, in the vicinity of the Atlanta Airport until they changed us off of Atlanta Radar on to Fulton County, see. Q. Okay. A. And nothing unusual. I mean, you know, it's just not a very good feeling, but it wasn't no bumping or no bad weather except visibility. Q. All right, do you recall the crash? A. Yes, sir. Q. All-right, just tell me what you recall about the crash. A. Well, the first thing was seeing a tree right in the landing lights that I can recall. I didn't know that we were going to crash. But it was before you can bat your eye, and I didn't have time to holler 'look out' or to even grab the controls to try to save us or anything, see. And I was immediately unconscious and didn't know anything about until after, you know, everything was over with. Q. Okay. Now, did you ever have occasion during the approach to observe any of the flight control instruments in the aircraft? A. Oh, yes. You know, that's all you've got to do is sit up there and look around, take down a number if they call you. I remember a few seconds before the crash I was looking at the instruments. The instruments—the flying instruments were on Mr. Howard's side. Mainly the ones in front of me were the instruments that, you know, tells you what kind of RPMs your motor's running, about your oil pressures and all of that. But the main instruments were to my left immediately in front of him. And I had noticed that air speed was down to 145. I think that plane cruises at about 200. And I noticed at that time our altimeter was between 13 and 1400 feet. Q. Did — A. And — Q. Did Mr. Howard have the gear down? A. Mr. Howard a moment or two before this said, 'Well, I better give it some flaps now. And he gave it he said 10 to 20 degrees. He said, 'I better give 10 to 20 degrees of flaps.' And the flap indicator was on my side, or more or less there in the center. And then the last words he said was, 'I better give it some wheels now,' which he meant putting the gear down, see. You can hear the flaps, and you can also hear the gear come down. But that was the only words said. Q. Okay, did you notice the altimeter during—Maybe I missed that. Did you say—What did you say on the altimeter? A. The altimeter was reading between 13 and 14. It's kind of like a clock. You know, one

hand was on one, and the other one was between three and four, which meant it was 1310, 1350, or 1390, you know. Q. Okay. A. Less than 14 and between 13 and 14. Q. Now, when you saw this tree, what kind of tree was it? A. Well, it was, you know, how an oak tree or a poplar or something looks when all of the leaves are gone. Well, it was just like you're kind of right in the top of it, see. And, you know, the lights went out we'll say. Q. All right, What's the next thing you recall after that? A. The next thing I recall was after the crash I was getting out of what I refer to as a tight place . . . Q. All right. Let me go back to the flight just a minute. On this flight back from Florida did you at any time handle the controls of the aircraft? A. I never at any time from Fulton County to Ft. Myers or Ft. Myers back to Fulton County ever touched the controls of that airplane. Q. All right. At any time from the time that you began your approach to Fulton County to the time you crashed did you ever break out of the clouds? A. We never broke out of the clouds one second. We never saw any light from the ground or nothing. Q. All right, sir. A. Never saw the airport. Couldn't see anything at any time from Columbus on in. Q. After the crash, and after you pulled yourself out of the wreckage and stumbled out however you did it through the woods to the dirt road, what were the weather conditions like there on the ground? A. It was drizzling rain and so foggy you couldn't see. And cold . . .

"Q. Mr. Pilgrim, let me ask you a couple of more questions about that. Do you recall in one of these statements that you've just been looking at that you said that you were approaching the fan marker light before this thing occurred, just before this crash? A. Well, I knew the fan marker was supposed to be down there in front of us somewhere. So, we'd have been approaching it, yes, sir. It's down near the bottom of the hill. Q. Well, a minute ago you told me that you didn't know where you were, but isn't it true that you—A. I mean, on final you know the fan marker's down there though. Bill was, you know—I think was expecting it to come on any second. Q. Well, Bill had looked at the approach plate prior to entering the approach, hadn't he? A. No, sir. Oh, prior to entering it? Q. Yes, sir. A. Yes, sir. I opened it out like I said back between Columbus and Newnan and had it laying there for him to view, to—you know, to look at and study, whatever he had to do as he was going in, to know his minimum. Q. Right. A. I saw him glancing through the thing in the light. Q. And there wasn't anything on there, was there, about a speed of 145 miles an hour? That's the standard speed in an approach in a 310, wasn't it? A. I have no idea. See, I don't know the limitations of a 310. Q. You know that all aircraft slow down from cruise speed as they get near the airport because they can't land at cruise speed, can they? A. At cruise? No. No, you can't land at cruise speed. Not safely. Q. But you

weren't alarmed by what you saw on the altimeter or on the air speed indicator, were you? A. I was not. I thought everything was normal. If I hadn't, I'd have been talking to him. Q. Do you recall on your deposition that was taken in 1974, when I asked you about this fan marker, you just said that you didn't have much to say about that but—Didn't this take place in that question and answer session that you had with another lawyer who said, 'Had Mr. Howard made any mention of the fan marker? Answer. No, sir. He had not mentioned that to you at all? Answer.'

"MR. HARTLEY: What page are you reading from?

"MR. NEELY: 23. 'The fan marker is something he received from the radios. This light comes on on the dash when he gets those, when he crosses over them, passes through that area.'

"THE WITNESS: Yes sir. I believe that's correct.

"BY MR. NEELY: Q. 'Question. Had you discussed the fan marker with Mr. Howard? Answer. No, sir. Question. Had you observed the lights come on? Answer. I saw the lights blinking on the dash.' A. I'm not sure it's the fan marker light. I mean, I don't know, you know, where it's talking about first and where I was. Q. But this was what you said at that time, isn't it? A. Okay, I might have said I saw the lights on the dash, yes, sir. Q. All right, sir. A. There's lots of lights on them dashes at night. Q. Well, a pilot knows that there is three lights up there as you go through the areas that let him know his position coming into the airport? A. I had no idea though about the three lights at Fulton County, see, because I had no knowledge of the—you know, of that approach or where he—you know, what his plane was equipped with either really. Q. But what is Terry? Terry is a fan marker, isn't it? A. It's one of the three, isn't it? Q. Well, in your testimony earlier you said that you knew you were approaching Terry and you knew Terry to be a fan marker, did you not? A. I must have if I said that. Q. And you knew that Terry would cause in the ordinary course of events—it would cause a light to blink on the dash, didn't you? A. From all indications we didn't reach Terry. We hadn't got that far. Q. I know, but you remembered seeing a light blinking on the dash. Is this what you said? A. Under oath I wouldn't say one way or the other. Q. All right, sir. A. I'm not going to tell no story. MR. NEELY: All right, sir."

The plaintiff testified that his airplane was equipped with a VOR receiver and generally he had used it and understood its operation.

There was evidence that a co-pilot would call out altitudes every 100' on an instrument landing. There was evidence that the Fulton County Airport VOR was erratic and "scalloped," that is, it was not a straight beam but waved or wiggled like a worm crawling across the

ground, and this was common knowledge. Also at the time of this crash there was a new instrument landing system (ILS) being installed. An ILS system provides a glide path for the airplane as well as direction. There was expert testimony that a transmission from the outer marker of the ILS would trigger the VOR Terry fan marker light in the airplane. A pilot who was the next to land shortly after this crash stated his VOR needle varied from $80^0$-$115^0$ and that he received a Terry marker signal when he crossed the Margaret fan marker.

An expert in aviation navigation and communications testified: ". . . Q. And you still go out and fly, knowing—fly in instrument conditions, knowing that the approach isn't safe? Is that what you are telling me? A. I fly in selected conditions in instrument conditions. Q. Did you fly—Did you select the instrument conditions that you flew down here in? A. Yes, I did. Q. In other words, you don't go out and fly in bad weather now, is that right? A. Not in general aviation aircraft, no, sir. Q. Well, how about commercial aviation aircraft? A. In commercial airplanes with the type of navigation equipment that is certificated for use in an airliner and with the kind of training that airline crews have and the fact that they generally operate in radar environments under close scrutiny, I think it's the safest way a person can possibly go some place. But instrument navigation, as it's applied to the airlines' operation in this country and how it's applied to the general aviation, are grossly different. In general aviation equipment, as in this case, the whole procedure is grossly oversold. There are many places just like this one where instrument facilities have been certificated that are way beyond their capacity to provide safe flight. Q. What I just find somewhat incredible is that here you are telling me that—that there is not an instrument approach in the country that's safe. A. I'm not telling you that. I said there are many of them in the country that are beyond their capacity to provide safe flight to general aviation styled equipment. Q. What I'm saying is that you're telling me that the government sets some standards about tolerances both on the ground and in the air and then turns around and sets up an approach without considering those tolerances. A. Yes, sir, I'm telling you that. Q. Totally without considering them? A. In many cases totally without considering them . . . Q. All right, I don't want you to get to the possibly. Just tell me what was in the airplane that came down here with you today. A. Well, I came on an Eastern 727. In the past Alaska Air Lines has Eastern overhaul the Alaska Air Lines 727s. During the time that our aircraft were ever overhauled we flew Eastern 727s on our routes. They're equipped with a flight director system where the cost of the instruments for one pilot exceed the cost of a Cessna 310."

"The rules of law governing the degree of care owed by an

operator of aircraft to his guest riding therein are the same as those governing the operator of a motor vehicle under similar circumstances, and in both cases the defendant operator is liable for injuries to his guest only in cases of gross negligence." *Sammons v. Webb,* 86 Ga. App. 382 (12a) (71 SE2d 832) (1952); *C. & S. Nat. Bank v. Huguley,* 100 Ga. App. 75 (110 SE2d 63) (1959); Code Ann. § 11-107. Similarly the defenses of assumption of the risk and avoidance of consequences are available to a defendant pilot of aircraft. *Crandall v. Sammons,* 62 Ga. App. 1 (7 SE2d 575) (1940).

"In its simplest and primary sense, assumption of risk means that the plaintiff, in advance, has given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone." Prosser, Law of Torts (4th Ed.) p. 440. "In by far the greater number of cases, the consent to assume the risk has not been a matter of express agreement, but has been found to be implied from the conduct of the plaintiff under the circumstances." Prosser, supra, at 445; see Harper and James, Law of Torts, Vol. 2, Ch. XXI.

"Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection. Unlike assumption of risk, the defense does not rest upon the idea that the defendant is relieved of any duty toward the plaintiff." Prosser, supra, at 416. "Closely allied to the doctrine of contributory negligence is the rule of 'avoidable consequences,' which denies recovery for any damages which could have been avoided by reasonable conduct on the part of the plaintiff. Both rest upon the same fundamental policy of making recovery depend upon the plaintiff's proper care for the protection of his own interests, and both require of him only the standard of the reasonable man under the circumstances." Prosser, supra, at 422; see Harper and James, supra, at 1231.

In the present case the plaintiff was a licensed pilot with 400 hours of flying time of four years duration. Although not licensed to fly instruments, he was familiar with VOR and the Fulton County Airport and had some instrument ground school instruction. During the flight here and the instrument approach when the plane crashed he was riding in the co-pilot's seat and assisting in the navigation of the plane. The evidence shows it was common knowledge that the Fulton County VOR was erratic and that a new ILS was being installed. There was also evidence that the airplane had "broken out" of the overcast and was on visual flight rules. Under these facts and the other circumstances of the case, we find the trial judge was

authorized to charge the jury on assumption of the risk and avoidance of consequences.

*Judgment reversed. Remanded to the Court of Appeals. All the Justices concur, except Jordan, P. J., and Hill, J. who dissent.*

ARGUED JULY 9, 1980 — DECIDED OCTOBER 22, 1980 —
REHEARING DENIED NOVEMBER 13, 1980.

*Edgar A. Neely, III, Randal H. Davis,* for appellant.
*G. Michael Hartley, Glover McGhee, William Norman Robinson,* for appellee.