76331. BRANDVAIN v. RIDGEVIEW INSTITUTE, INC. et al.
(372 SE2d 265)

BEASLEY, Judge.

Deborah Brandvain appeals the trial court's grant of the defendants' j.n.o.v. in this medical malpractice case. The issues on appeal relate to legal duty, causation, and preliminarily, j.n.o.v. procedure. Mrs. Brandvain sued individually and in her capacity as administratrix of her husband's estate for his wrongful death by suicide while a patient at Ridgeview.

Viewed in the light favorable to the verdict and judgment, as we are required to do, *Pendley v. Pendley*, 251 Ga. 30, 31 (1) (302 SE2d 554) (1983), the evidence showed the following. Ridgeview Institute is a hospital specializing in the treatment of alcohol and drug abuse. It has a renowned program, including a component aimed specifically at health care professionals. One of the defendants, Dr. Douglas Talbott, an internist and addictionologist, is director of Ridgeview's health

professionals program which he began in 1976. He is a recovering alcoholic as is defendant Dr. Blevins, a psychiatrist, who was Walter Brandvain's primary physician at Ridgeview. Walter Brandvain was a 31-year-old doctor in his second year of residency at Elmhurst Hospital in New York City. He and plaintiff were married in 1976. Plaintiff was aware of his frequent marijuana use and LSD experimentation over the years, but was unaware of other drug use until 1982, when he advised her that he had taken drugs from Elmhurst for his own use and was about to be discovered. The drugs included morphine. As a result of this, he was monitored by the doctors at the hospital, including drug testing, but allowed to complete his residency work that year. He was required to go into therapy, which he did with Dr. Brower beginning in April 1982, and to sit out a year of his residency at Elmhurst. During that year, he went into a psychiatric residency at Brookdale Hospital.

On Valentine's Day 1983, Walter told plaintiff that he had been injecting drugs which he had ordered after obtaining his medical license and DEA number. He had used all of these, including Demerol and morphine, and had no more. She took him to Payne Whitney where he was admitted as an inpatient and stayed for two to three weeks. He then went to Hazelden, which specializes in alcohol and drug abuse. He left that program early due to his dislike of its Christian emphasis, he being Jewish. He then was admitted to the Mayo Clinic where he was treated for a chronic bladder problem, including shots of Demerol. He did not advise them of his drug abuse.

His new psychiatrist, Dr. Karkus, put him on methadone due to his cocaine and heroin addictions.

In November 1983, he and plaintiff went to Mexico, where Walter had attended medical school, for a month's vacation. There, he began "acting strange." After their return home, he began disappearing for long periods of time, using street heroin and cocaine even though still on methadone. Walter told his wife he had been considering suicide. She called another psychiatrist, Dr. Lefer, who admitted Walter that day to Roosevelt Hospital with a tentative diagnosis of manic depression. He placed him on Lithium and Walter was released. Walter then acknowledged to plaintiff that he had a drug problem and needed help. They checked various programs, all of which required patients to be detoxed from methadone before entering. Walter checked himself into the locked ward of the Smithers Institute of Roosevelt Hospital for detoxification on December 27. There, while attending an Alcoholics Anonymous meeting, he ran out of the meeting and was pursued by Dr. Gallegos, a recent patient of the Ridgeview program who was attending the meeting to assist his AA sponsor. He told Walter about Ridgeview and Walter called plaintiff who talked to Dr. Gallegos, who was in the process of moving to

Atlanta to join the Ridgeview staff. She talked to Walter's parents about the program and they were interested but concerned about the expense.

Shortly thereafter, Walter called her and told her he had attempted to go out an upper floor window at Roosevelt and that he was very distraught and upset. On New Year's Eve, he knocked down a guard and ran out without any coat, taking a cab to his parents' home. When they saw him, they told plaintiff to get him into Ridgeview and they would pay for it. She called Ridgeview and Dr. Talbott told her to bring Walter to Atlanta immediately. She did so and was met at the airport near midnight by Dr. Talbott, who drove them to Ridgeview. She saw Walter again on New Year's Day and spoke with Dr. Talbott. She was advised not to accept any phone calls from Walter for the first ten days of his treatment. She told Dr. Talbott about the suicide attempts, although he had no recollection of that. She returned to New York.

Walter was admitted to one of the unlocked alcohol and drug units, Cottage A, by Dr. Talbott. Dr. Talbott's notes of January 1 reflect a diagnosis of cocaine, opiate, and THC (marijuana) addiction, and knowledge of Walter's Hazelden and Roosevelt stays. He also diagnosed dysthymic disorder. Dr. Talbott was not to be Walter's primary physician, but had merely signed him in as an emergency admission, originally on Dr. Browne's service. Talbott dictated his admission history on Sunday, January 1 and it was transcribed on January 3. It contained no mention of suicidal ideations or prior attempts. Because of the holiday, Dr. Talbott, who was on call for all patients, continued to prescribe medications for Walter for his withdrawal symptoms, including tremors and cramps.

During the day on Monday, January 2, Walter became more agitated, demanding to be released. He began to turn over tables and as a result of this behavior, Dr. Talbott ordered him transferred to Cottage C, a locked unit for psychiatric patients. Since Dr. Browne had not seen Walter, he was transferred to Dr. Blevins, who saw him and noted a probable diagnosis of opiate and cocaine dependence and "near toxic psychosis." While in C on January 2, Walter was placed initially in the seclusion hall, where all rooms entering it can be locked to prevent the patient's entry and the patient can be observed through locked glass doors closing off the hallway from the rest of the unit. In the hall, Walter began kicking the doors and attempting to leave, so he was placed in the seclusion room with only a mattress and a locked door through which the patient can be observed until allowed to leave. He remained there for an hour and was seen by Dr. Blevins.

On January 3, Walter was transferred to Cottage B, the other alcohol and drug unit. Prior to that transfer he had signed a request

to be released, which he later withdrew. After the transfer, he signed a second request, which he also withdrew after attending a meeting of Caduceus, a group of doctors undergoing treatment at Ridgeview. He continued to show withdrawal signs, including cramping, panic feelings, dehydration, and increasing agitation. He slept only three hours that night.

On the morning of January 4, Walter refused to attend any groups and became more agitated. Around noon on January 4, Dr. Blevins signed a form 2014 on Walter, certifying that he was in need of involuntary treatment, was drug or alcohol dependent, could present a substantial risk of injury to himself or others, and should be transferred to an evaluating facility. This began the process of involuntary commitment. OCGA §§ 37-7-64; 37-7-81; see *Davis v. Charter By-The-Sea*, 183 Ga. App. 213 (1) (358 SE2d 865) (1987). It was based partially on the staff's consensus that Walter might "wander off cottage and into harm's way." Walter was transferred back to Cottage C. He signed a request for a court-appointed attorney and writ of habeas corpus. He appointed plaintiff as his representative but refused to authorize Ridgeview's staff to discuss his treatment with her.

He was examined by Dr. Udell, the consulting psychiatrist for Ridgeview on January 4 at the request of Dr. Blevins. Dr. Udell noted Walter's "starey look, stiff walk, dehydration, and depressed and angry mood." While he noted no evidence of thought disorder, he did note Walter's poor judgment and recommended that he be kept on the closed unit and encouraged to participate in the C programs. His diagnosis was "toxic brain syndrome, mixed." At that time, he did not believe Walter was suicidal. He was unaware of Walter's previous expressions of suicidal intent.

During the night of January 4, Walter did not sleep and was noted by June Davis, the night shift nurse, to be angry and hostile.

On the morning of January 5, Walter violated phone restrictions by attempting to call his wife. Due to his continued agitation and pushing of limits, he was placed on the seclusion hall. Greg Thomas was one of the clinical assistants, non-medical personnel who assist nurses in the care of patients. While observing Walter on the hall at approximately 11:45 a.m., he saw Walter go into the alcove where the bathroom was located. Thomas could not see Walter and went to investigate. He found Walter with one arm of his sweater around his neck and the other caught in an upper corner of the bathroom door. The sweater was taut and Walter's knees were bent. Thomas and Glenn McCoy, another clinical assistant who arrived seconds after Thomas, removed the sweater from Walter's neck. Walter ran from the seclusion hall, grabbed a ping pong net and began swinging the metal ends of the net at staff. He had to be subdued with foam tipped poles used for such incidents. He was placed in the seclusion room.

Clyde Beckley was a shift staff coordinator who oversaw the clinical assistants in C and also a non-medical employee. He was called out of a group meeting and spoke with Glenn McCoy about the incident, and he spoke with Walter who told him he had not meant to hurt anyone. Jeff Turner was staff coordinator of the next shift. He usually arrived early to get a report from Beckley of the prior shift's events. He did so that day and was informed of the sweater incident by Beckley.

Dr. Blevins was called to the unit and spoke only with one staff member, Turner, about the incident. He talked with Walter who said he did not want to die but wanted to be relieved of all his anxiety and fear. Dr. Blevins concluded that the incident was a "suicide gesture," not a "suicide attempt," and that Walter was not suicidal. He did not order any suicide prevention measures.

No entry was made in the interdisciplinary notes about this incident by Thomas on January 5, because he had not been assigned to Walter. Beckley made no entry in the notes because he had not witnessed the incident. No note was made by McCoy.

That afternoon, Walter was visited by his appointed attorney, Ray Gary. Gary spoke with him on the observation hall but was not allowed to be alone with him. An unidentified staff member told him he was not permitted to leave Walter alone. Gary had represented numerous patients under similar circumstances and could not recall such a restriction at any other time.

Nurse Davis came back on shift at 11:00 p.m. on January 5. She was orally advised by Nurse Jones of the sweater incident at report between shifts. Jones had been advised of the incident by Nurse Nordland, who had not witnessed the incident but was the nurse on the shift on which it occurred. It was described to Davis as a "gesture." While no precautions had been taken by Nordland or Jones as a result of it, Davis determined that Walter needed close observation and directed her clinical assistants to put him on fifteen-minute checks, one of the suicide prevention measures listed in Ridgeview's "Suicide and Self-Injury Prevention" policy. No written note of this was made, but Davis orally reported it to Nordland when she returned for the 7:00 a.m. shift on the morning of January 6. Nordland did not continue the fifteen-minute checks or take any other precautions concerning Walter.

Dr. Blevins met with Walter at 9:00 a.m. and informed him that his commitment hearing would commence at 11:00 a.m. He again asked him about the sweater incident and Walter denied any intention of harming himself or others. Walter was seen by staff going into his room at 9:45 a.m.

During the 10:00 a.m. rounds, Walter was found hanging by his

shirt from the shower handgrip in his room. Efforts to resuscitate him failed.

At 9:54 a.m., a social worker began a 59-minute telephone call with plaintiff during which plaintiff detailed Walter's drug use, his suicidal ideations, and his prior attempt. This accorded with Ridgeview's practice of having one of its social workers take a social history from a patient's family member within five days of admission.

The jury returned a verdict of $1.3 million in favor of plaintiff on her wrongful death claim against Dr. Blevins and Ridgeview. It returned a verdict in favor of all defendants on her claim as representative of Walter's estate.

Judgment reflecting the verdict was entered. The next day, without any motion by defendants, the court entered the j.n.o.v. here at issue.

1. (a) Plaintiff claims error by the trial court's grant of j.n.o.v. where no motion for it was made by defendants.

Defendants did move for directed verdict at the close of plaintiff's case and renewed this motion at the close of the case. The trial court allowed the case to go to the jury, reserving ruling on the directed verdict motion until after the jury's verdict. Judgment was entered thereon, and the next day the court without further hearing granted the motion and entered judgment for defendants, thereby setting aside the judgment based on the verdict.

Although no motion for j.n.o.v. was pending when the court in effect ordered a j.n.o.v. sua sponte, this naturally followed the ruling on the pending motion for directed verdict, because the existing judgment became invalid as a matter of law. Actually, what the court did was to "reopen" the judgment, in the word of OCGA § 9-11-50 (b).

Before the court loses jurisdiction of the case by some event such as the filing of a notice of appeal from the judgment, the motion for directed verdict remains pending even though judgment was entered on a contrary verdict, as in this case. The motion is not mooted by the entry of judgment but is preserved by the court's reserving ruling.

The sequence of events here mirrors that in *Mayor &c. of Savannah v. Palmerio*, 242 Ga. 419 (249 SE2d 224) (1978), except that a motion for new trial was there pending when the court ruled on the carry-over motion for directed verdict. Although here, as well as in that case, ruling on the motion prior to the entry of the first judgment would have been procedurally and conceptually more orderly as contemplated by OCGA § 9-11-50 (b), doing so afterwards did not constitute an unauthorized act.

OCGA § 9-11-50 provides for the filing by the losing party of a j.n.o.v. motion but does not require one before the trial court may rule on a still-pending motion for directed verdict. *Mayor &c. of Savannah*, supra at 420 (1); *Miller & Meier & Assoc. v. Diedrich*, 174

Ga. App. 249, 250 (1) (329 SE2d 918) (1985); see *Norton v. Snapper Power Equip.*, 806 F2d 1545, 1547 (1) (11th Cir. 1987). Since the test for granting the j.n.o.v. is the same as the test for granting a directed verdict, OCGA § 9-11-50 (a) & (b), *Horton v. City of Macon*, 144 Ga. App. 380, 381 (2) (241 SE2d 311) (1977), making such a motion after a favorable ruling on the motion for directed verdict would be redundant if not a useless act. Thus, the trial court's ruling on the pending motion for directed verdict and grant of j.n.o.v. based on it without a formal motion for j.n.o.v. was not error.

(b) Contrary to plaintiff's further contention, the grounds ruled upon by the court were adequately raised in the motions for directed verdict, as they must be in order to be addressed by the trial court and this one. *Grabowski v. Radiology Assoc.*, 181 Ga. App. 298, 299 (2) (352 SE2d 185) (1986).

2. Brandvain's first enumeration claims error in the trial court's initial premise of the j.n.o.v., that in a medical malpractice case "[t]here exists a serious legal question as to whether or not an individual, clinic or hospital has a duty to prevent suicide by a patient. . . ."

While there is no duty to guarantee that a patient will not commit suicide, Georgia has long recognized a duty with regard to treatment of patients by doctors and other individual health care professionals as well as private hospitals such as Ridgeview. Defendants did not contend below that there was no duty. In fact Dr. Blevins, Dr. Talbott, and Dr. Norris, a psychiatrist/addictionologist called as an expert by defendants, as well as plaintiff's expert, Dr. Morgan, all testified that there was a duty to the extent possible under reasonable medical practice to prevent suicide of a hospitalized patient.

As to the physician, the duty is that inherent in the doctor-patient relationship, which, if breached by failure to exercise the requisite degree of skill and care, with that failure being the proximate cause of the injury, will result in liability. OCGA § 51-1-27; *Hawkins v. Greenberg*, 166 Ga. App. 574, 575 (1) (a) (304 SE2d 922) (1983); *Norton v. Hamilton*, 92 Ga. App. 727, 731 (89 SE2d 809) (1955); see *Cherokee County Hosp. Auth. v. Beaver*, 179 Ga. App. 200 (1) (345 SE2d 904) (1986).

The duty owed by Ridgeview is that enunciated in *Emory Univ. v. Shadburn*, 47 Ga. App. 643 (1) (171 SE 192) (1933), aff'd 180 Ga. 595: "A private hospital in which patients are placed for treatment by their physicians, and which undertakes to care for the patients and supervise and look after them, is under the duty to exercise such reasonable care in looking after and protecting a patient as the patient's condition, which is known to the hospital through its agents and servants charged with the duty of looking after and supervising the patient, may require. This duty extends to safeguarding and protecting

the patient from any known or reasonably apprehended danger from himself which may be due to his mental incapacity, and to use ordinary and reasonable care to prevent it. [Cits.]"

That standard has been repeatedly recognized and affirmed by this court as well as the Supreme Court in *Shadburn*, supra. E.g., *Johnson v. Parnes*, 163 Ga. App. 404, 405 (294 SE2d 624) (1982); *Doctor's Hosp. of Augusta v. Poole*, 144 Ga. App. 184 (1 A) (241 SE2d 2) (1977); *Hospital Auth. of Hall County &c. v. Adams*, 110 Ga. App. 848, 853 (140 SE2d 139) (1964); *Emory Univ. v. Lee*, 97 Ga. App. 680, 693 (104 SE2d 234) (1958); *Tate v. McCall Hosp.*, 57 Ga. App. 824, 828 (196 SE 906) (1938); *Stansfield v. Gardner*, 56 Ga. App. 634, 641 (1) (193 SE 375) (1937); *Brawner v. Bussell*, 50 Ga. App. 840 (4) (179 SE 228) (1934).

To the extent that the j.n.o.v. held that there was no such duty, it was in error. Because the court went further, however, and "assumed for the sake of this judgment" that there could be such a duty, we proceed to consider additional enumerations.

3. Assuming such a duty, the court found that "a fundamental conflict arises in the tort law of Georgia, since suicide is an intentional and volitional act by its very nature, . . . and since a fundamental principle of Georgia law is that an individual cannot profit by his or her own wrongful conduct. . . ." The court then held as a matter of law that such intentional act of self-destruction under the doctrine of comparative negligence must equal or exceed any mere acts or omissions of others constituting negligence in failing to prevent such suicide, and that such volitional act was the sole proximate cause of Walter Brandvain's death.

The court acknowledged that there may be situations where, due to differing grades of mental competency, a suicidal individual suffering from mental conditions ranging from inability to know right from wrong to an altered mental state, who is in the care of a health care professional with physical control over the individual or standing in a special relationship with him, the health care professional might be liable to the suicidal individual, "for all damages in the situation of no culpability for self-destruction [i.e., the suicidal individual is legally insane under OCGA § 16-3-2, which provides that insanity is a defense to a crime if the accused did not have the mental capacity to distinguish between right and wrong] or may be liable for no damages or such reduced damages under the doctrine of comparative negligence when there is reduced capacity [defined as delusional compulsion, retardation, intoxication, or mental disease or defect.]" These gradations of mental disturbance were not defined in the j.n.o.v.

The issue of proximate cause was presented by defendants in their motion for directed verdict and is thus considered here. *Grabowski v. Radiology Assoc.*, supra.

(a) Suicide has long been the subject of intense religious, ethical, legal and medical debate. See generally, Schwartz, "Civil Liability for Causing Suicide: A Synthesis of Law & Psychiatry," 24 Vand. Law Rev. 216 (1971). At common law, it was a felony, resulting in the forfeiture to the crown of the deceased's property and an ignominious burial in the highway with a stake driven through his heart. 4 W. Blackstone, Commentaries *190. Although Georgia adopted the common law of England, Cobb's 1851 Digest 721, the provision making suicide a crime appeared in no other code and is not presently part of the law of this state. See OCGA, Title 16; see generally, 83 CJS Suicide § 2. Suicide was also originally a legal statutory defense to payment of insurance benefits, Ga. Code Ann. § 56-909 (1953), but that was repealed in 1960, Ga. Laws 1960, pp. 289, 754, leaving the matter one of contract between the parties. The court's holding that suicide is always "wrongful" in a legal sense finds no basis in the present law of this state.

The gradations of mental illness used by the court in its sliding scale of potential liability of medical health care professionals in cases of suicide also do not have legal significance per se in the determination of the duty owed to the patient and the issue of proximate cause. The medical profession recognizes a multitude of mental illnesses, from the most severe psychosis to the anxieties experienced by most of us in our daily lives. Diagnostic & Statistical Manual of Mental Disorders (Third Ed., Revised 1987) (hereinafter cited as DSM-III-R).

Georgia law also recognizes a range of disorders and makes allowance for these differences considering the context. The "right/wrong" standard, supplemented by the "delusional compulsion" standard, is used for determination of criminal responsibility, i.e., if one is unable to distinguish right from wrong, or, because of delusional compulsion due to mental disease, injury, or congenital deficiency, cannot resist committing the crime, he is not held criminally responsible for his act because he was unable to formulate the requisite intent or cannot resist the compulsion. OCGA §§ 16-3-2; 16-3-3. This does not mean, however, as intimated by the trial court, that one who is psychotic is always legally insane in the criminal context. Wilson v. State, 257 Ga. 444, 449 (11) (359 SE2d 891) (1987); Nelson v. State, 254 Ga. 611, 613 (1) (331 SE2d 554) (1985).

The law provides for treatment of the "mentally ill," defined as "having a disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." OCGA § 37-3-1 (11). They may be involuntarily treated if they present a substantial risk of imminent harm to themselves or others. OCGA §§ 37-3-1 (12) & 37-3-40 et seq. Also, a person incapacitated by drugs or alcohol may be involuntarily

treated. OCGA Title 37, Article 7. " 'Incapacitated by alcohol or drugs' means that a person, as a result of the use of alcohol or drugs, exhibits life-threatening levels of intoxication, withdrawal or imminent danger thereof, or acute medical problems; or is under the influence of alcohol or drugs to the extent that he is incapable of caring for himself or protecting himself due to the continued consumption thereof." OCGA § 37-7-1 (13). The latter is the procedure which had been instituted for Walter Brandvain by Ridgeview and Dr. Blevins. OCGA §§ 37-7-43 & 37-7-81.

Even though a mentally ill or drug or alcohol dependent person may not need commitment, they may require a legal guardian because they "lack sufficient understanding or capacity to make significant responsible decisions concerning their persons or to the extent they are incapable of communicating them." OCGA § 29-5-1.

(b) It is in this legal context that we address the issue of proximate cause as determined by the trial court.

"It is hornbook law that for recovery to be allowed in a tort case, there must be a failure to use a standard of care by the defendant, which proximately causes an injury to the plaintiff, to whom a duty is owed. Inextricably entwined with concepts of negligence and proximate cause is a notion of foreseeability, not foreseeability as to the particular harm but that some harm would occur. . . . In considering the matter of proximate cause, Georgia courts and courts from other states have used various yardsticks, a few of which are as follows: remoteness in time and space, [Cit]; independent intervening causes, [Cit]; and foreseeable natural and probable consequences, [Cit]. No matter what test is used in determining the issue of proximate cause, all of the tests envision some reasonable apprehension of harm. 'The range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury.' *Palsgraf* [*v. Long Island R. Co.*, 248 N. Y. 339] at 345. [(162 NE 99) (1928)]." *Western Stone &c. Corp. v. Jones*, 180 Ga. App. 79, 80 (348 SE2d 478) (1986); see *McAuley v. Wills*, 251 Ga. 3 (303 SE2d 258) (1983).

The judge here found that the negligence of defendants was not the proximate cause of Walter's death, as a matter of law, due to Walter's intervening volitional act of suicide.

Although no authority for this holding is cited by the court, it appears to be based on the concept of an intervening criminal act, which under some circumstances may be found to be the "supervening" or "intervening" proximate cause, relieving a defendant from responsibility for his negligence. E.g., *Bradley Center v. Wessner*, 250 Ga. 199, 202 (296 SE2d 693) (1982); *Collie v. Hutson*, 175 Ga. App. 672, 673 (2) (334 SE2d 13) (1985); *Hercules v. Lewis*, 168 Ga. App. 688, 689 (309 SE2d 865) (1983); see *Arnold v. Athens Newspapers*,

173 Ga. App. 735, 737 (1) (327 SE2d 845) (1985).

Even if suicide were still a crime in Georgia, that alone does not make any act of suicide a per se legally supervening/intervening act. "[I]f the intervening criminal act is a reasonably foreseeable consequence of the defendant's negligent conduct, the legal, causal connection between that conduct and injury is not broken." *Hercules v. Lewis*, supra at 689.[1] Considering the evidence in this case, this question would still be one for the jury. *Doctor's Hosp. of Augusta*, supra at 185 (2).

(c) The court also held as a matter of law that Walter's "volitional" act of self-destruction was the "ultimate act of assumption of the risk and such intentional fault that must equal or exceed any acts or omission of the Defendant[s] under the doctrine of comparative negligence."

OCGA § 51-11-7 states that "[i]f the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover. In other cases the defendant is not relieved, although the plaintiff may in some way have contributed to the injury sustained."

This modified comparative negligence statute, while appearing straightforward on its face, contains a number of legal concepts and has engendered much discussion and litigation. C. J. Hilkey, "Actions For Wrongful Death in Georgia," 22 Ga. B. J. 459 (1960); see generally, D. Sobelsohn, " 'Pure' vs. 'Modified' Comparative Fault: Notes On The Debate," 34 Emory L. J. 65 (1985).

Assumption of the risk, encompassed by the statute, means that a plaintiff "has given his express consent to relieve the defendant of an obligation of conduct toward him and to take his chance of injury from a known risk." *Owens-Illinois v. Bryson*, 138 Ga. App. 78, 79 (225 SE2d 475) (1976).

" 'Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection. Unlike assumption of risk, the defense does not rest upon the idea that the defendant is relieved of any duty toward the plaintiff.' [cit.]." *Osburn v. Pilgrim*, 246 Ga. 688, 695 (273 SE2d 118) (1980).

Under the circumstances of this case, where Walter was being held by Ridgeview pursuant to the certificate signed by Dr. Blevins and could not leave the hospital, defendants could not legally be relieved of their duty to him, and therefore assumption of the risk was

---

[1] In connection with duties arising due to foreseeable violence by the mental patient, see the latter two special concurrences in *Roberts v. Grigsby*, 177 Ga. App. 377, 383 (339 SE2d 633) (1985).

not applicable. *Stansfield v. Gardner*, 56 Ga. App. 634, 643 (193 SE 375) (1937); *Brawner v. Bussell*, 50 Ga. App. 840 (179 SE 228) (1934) (physical precedent only, Rule 35 (b)); see *Assoc. Health Systems v. Jones*, 185 Ga. App. 798, 799 (366 SE2d 147) (1988). Whether it would be appropriate to consider if the certificate had not been signed need not be addressed.

This leaves for our consideration the question of the negligence of Walter. The trial court found that since Walter was "a highly intelligent and educated young man with no significant illnesses other than chemical dependence, who was neither psychotic, delusional, or suffering from reduced mental capacity; [he] does not fit any category of either reduced culpability or non-culpability."

This finding, however, flies in the face of the evidence presented at trial by both plaintiff and defendants. Walter had used marijuana, morphine, cocaine, and heroin for a long period and was addicted. This addiction is recognized by psychiatry as an Organic Mental Disorder. DSM-III-R, p. 165 et seq. All of the doctors testifying stated that suicide is a very real risk in cocaine users, and particularly so during the withdrawal stage. Walter was chemically toxic when admitted and near toxic psychosis. Dr. Udell, Ridgeview's consulting psychiatrist, gave as a tentative diagnosis, "toxic brain syndrome," and noted that Walter's judgment was impaired.

While there is no authority for holding that a patient is, as matter of law, so contributorily negligent that he could not recover in tort, there is authority for the proposition that a patient may be so mentally ill that, as matter of law, he is not held to exercise any degree of care for himself, and, therefore, cannot be contributorily negligent. In *Swofford v. Cooper*, 184 Ga. App. 50 (360 SE2d 624) (1987), Jerry Swofford, the adopted son of the Swoffords, was hospitalized in a mental hospital. He was treated by Dr. Cooper, a psychiatrist. He was mentally retarded and had, in his teenage years, become so aggressive and combative that his parents had to hospitalize him. Jerry had been hospitalized for eleven months, during which time he expressed homicidal threats. He was given a two-week pass for Christmas. After having been home for four days, he stabbed his father and mother as they slept, killing his father. Mrs. Swofford sued for the wrongful death of her husband, her own injuries, and, as representative of Jerry, for his emotional suffering as a result of killing his father. Plaintiff appealed the grant of the doctor's motion for summary judgment. One of the grounds upon which the trial court granted it, as to Jerry's claim, was that Jerry himself was negligent. This court reversed, finding that "[t]he record demonstrates that Jerry was psychotic when he stabbed his father. (Jerry was declared incompetent to stand trial . . . ) Thus, 'he could not have been held to the exercise of any degree of diligence.' *Emory Univ. v. Lee*, [97 Ga. App.

680 (104 SE2d 234) (1958)] at 702." *Swofford,* supra at 54 (4).

*Lee,* supra, involved a heart attack patient admitted to a hospital and treated with drugs, including morphine. As a result of the "deranged mental condition" occasioned by the morphine, the patient fell or jumped from an upper floor window and was injured. In affirming the denial of j.n.o.v. to defendants, this court held that "[i]f the evidence in the case sub judice conclusively proved that the plaintiff was on the occasion when he was injured entirely bereft of reason, it is obvious that he could not have been held to the exercise of any degree of diligence. Hence the provisions of [OCGA § 51-11-7] would not in such circumstances be adjusted to the issues of the case." *Lee,* supra at 702 (6).

Whether Walter was so disabled by his prior drug use and the depression of the dysthymic disorder, DSM-III-R, p. 230, § 300.40, as to be legally incapable of being contributorily negligent was not presented below by plaintiff and thus need not be further addressed. The "volitional" nature of the act, however, must be.

"Volition" is defined as "the act of willing or choosing: the act of deciding (as on a course of action or an end to be striven for): the exercise of the will. . . ." Webster's Third New International Dictionary 2562 (3d ed. 1981). All of the doctors testifying stated that a true suicide is always volitional, in that the person intentionally takes the action which ends his life. This, however, does not make the act a rational one or one which negates the duties of the hospital and doctor to take reasonable steps to prevent the patient's death.

In *Misfeldt v. Hosp. Auth. of Marietta,* 101 Ga. App. 579 (115 SE2d 244) (1960), a woman diagnosed as a probable paranoid schizophrenic was hospitalized. She went into a bathroom and jumped from a third story window, injuring herself. "It is true that one is not bound to foresee and guard against casualties which are not reasonably to be expected, or which would not occur save under exceptional circumstances, or which result from an unexpected act of the person injured. [Cit.] . . . If the plaintiff's wife was not mentally ill, and her injuries were done pursuant to her own rational and calculated act, then she would be the cause of her own injuries and her husband could not recover. [cit.]" *Misfeldt,* supra at 583; *Stansfield v. Gardner,* supra at 643; *Brawner v. Bussell,* supra. There, it was error for the trial court to direct a verdict because the evidence of her illness and the reasonableness of the steps taken by the hospital to protect her from herself were disputed and for the jury. *Misfeldt,* supra at 583; see, e.g., *Hawkins v. Greenberg,* supra at 578 (1 (b)); *Johnson v. Parnes,* supra at 405; *Tate v. McCall Hosp.,* supra at 828; *Stansfield,* supra.

Thus, the fact that Walter's act was volitional did not make it a rational act, nor did that alone relieve the defendants of their duty to

him.

This is not to say that no suicide is ever rational. In situations of terminal illness, such as Alzheimer's disease or AIDS, where there is no hope of recovery and only untold suffering with which to contend, there is already the constitutional right to refuse treatment. *In re L. H. R.*, 253 Ga. 439, 446 (321 SE2d 716) (1984). Whether more affirmative steps may also be constitutionally protected has not yet been decided in the legal context, but may be rational under some circumstances. Note, "Voluntary Active Euthanasia For The Terminally Ill & The Constitutional Right To Privacy," 69 Cornell L. Rev. 363 (1983-1984).

If such a patient is hospitalized and expresses the desire to refuse further treatment, thus passively committing suicide, there are already procedures in place to protect the medical establishment. *In re L. H. R.*, supra; *Bouvia v. Superior Court*, 225 Cal. Rptr. 297 (179 Cal.App.3d 2 Dist. 1127) (1986); *In re Quinlan*, 355 A2d 647 (70 N.J. 10) (1976).

4. Finally, to the degree that the defenses of comparative or contributory negligence and intervening criminal acts were applicable to this case, these were matters for the jury's consideration and were not determinable as a matter of law. *Collie*, supra at 673 (2); *Southern Intermodal Logistics v. Coleman*, 175 Ga. App. 853 (334 SE2d 888) (1985); *Warner v. Arnold*, 133 Ga. App. 174, 179 (2) (210 SE2d 350) (1974). This is particularly true here, where all of the physician witnesses called by defendants agreed that if Walter's act on January 5 were a suicide "attempt" instead of a "gesture," both the hospital and Dr. Blevins were negligent. Thus, even under defendants' version of the case there was a factual question to be decided.

The only theory which would make the j.n.o.v. entered here legally viable is that in all cases of suicide the defendant doctor or hospital is not responsible as a matter of law, regardless of the foreseeability of the suicide or the reasonableness of the steps taken to prevent it. If this is to be the policy of this state, it must be so declared by the legislature.

*Judgment reversed. Birdsong, C. J., and Banke, P. J., concur.*

DECIDED JULY 11, 1988 —
REHEARING DENIED JULY 28, 1988

*Robert C. Lamar, David W. Davenport*, for appellant.

*Rush S. Smith, Jr., R. Jerry Kirkpatrick, Brynda S. Rodriguez*, for appellee.

*Jack S. Schroder, Jr., James F. Owens, Thomas W. Bennett*,

*Don C. Keenan, David S. Bills*, amici curiae.