## A93A1954. UNITED SERVICES AUTOMOBILE ASSOCIATION v. GOTTSCHALK.

(441 SE2d 281)

ANDREWS, Judge.

United Services Automobile Association (USAA) appeals from judgment entered on the jury's finding that a policy of insurance was in place on Gottschalk's automobile when his son was involved in an accident on September 9, 1988.

1. USAA's first enumeration is that the court erred in not granting its motion for j.n.o.v.

" 'A directed verdict is proper only where there is no conflict in the evidence as to any material issue and the evidence introduced together with all reasonable deductions or inferences therefrom demands a particular verdict.' [Cit.] Even 'slight' evidence was regarded as sufficient to prevent the devastations of a directed verdict, in *Worth v. Ga. Farm &c. Ins. Co.*, [174 Ga. App. 194 (330 SE2d 1) (1985)]. Where there is 'some evidence,' or 'any evidence' supporting the respondent's assertions, disputed issues are created which are for the jury resolution." *Grabowski v. Radiology Assoc.*, 181 Ga. App. 298, 301 (3) (352 SE2d 185) (1986). The same standard applies when considering the denial of a j.n.o.v. *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 112 (1a) (372 SE2d 265) (1988), aff'd 259 Ga. 376 (382 SE2d 597) (1989); *Ostroff v. Coyner*, 187 Ga. App. 109, 115 (3b) (369 SE2d 298) (1988).

Here, USAA moved for directed verdict on the sole ground that "at the time the notice of cancellation was sent out to Mr. Gottschalk he was clearly 60 days or more in arrears [on his premium payments]."

Viewed with all inferences in favor of Gottschalk, the evidence was that he had carried insurance with USAA since 1969, including home and automobile insurance. The 1983 Subaru involved in the wreck was listed on the policy, along with three other automobiles. On June 16, 1988, USAA issued an "Amended Declarations" page, reflecting the auto policy's renewal date of July 6, 1988 to January 6, 1989. The policy itself stated that "if this is a renewal or continuation policy, we will cancel only: a. for nonpayment of premium; or [reasons not involved here]."

Prior to 1988, if payments were not timely, USAA had included on the face of the premium notices a statement that the account was delinquent; a certain amount needed to be paid by a certain date; if not paid and the account became 60 days delinquent, the policy would be cancelled. USAA is a membership association and the membership objected to this language. In its place, the following appeared: "Amount billed on previous statement was not received by closing date. If you have made a recent payment that is not shown on this

statement, please subtract it from the payment plan of your choice and remit the difference. Thank you."

Each notice contained a "closing date," for example, December 21, 1987, and a "next closing date," for example, January 21, 1988. The removable payment coupon stated, for this example, "To avoid a late fee, payment is due in our office by 01-11-88."

Gottschalk lived in Perry and was working in north Georgia as a real estate appraiser. For that purpose, he maintained an Atlanta apartment and returned home on the weekends. His wife picked up the mail at their post office box and left bills on his desk for his attention on the weekends. His practice was to pay the bills once a month.

The premium notices provided three payment options, payment in full, payment by the "regular plan," and payment on the "extended plan." This last option provided for the lowest periodic payment, required monthly, and was used by Gottschalk. In 1987, Gottschalk experienced some financial difficulties and was one payment behind. He contacted the 800 number maintained by USAA and was told that if a payment had been sent late and crossed the next billing statement in the mail, the payment would not have been credited. In that case, Gottschalk was told to deduct "that payment from the current billing statement and pay the balance, . . . and that's what I've been doing ever since 1987 and there's never been anything to alert me to the fact that that's not something that they wanted me to do."

The payment history of Gottschalk reflected that payments were made in this fashion throughout 1988.[1] The last statement received by Gottschalk was that showing a closing date of August 19, 1988, and no "next closing date." The statement of mailing by USAA reflected this statement had been mailed on August 23, 1988 from San Antonio, Texas. This statement included a cancellation notice that the account had not been paid as required and that the insurance "will be cancelled for nonpayment of premium . . . effective September 7, 1988." It further provided that, upon receipt of payment postmarked before September 7, 1988, the coverage would continue. The amount shown as due was $821.65. This statement was not opened by Gottschalk until after the September 9 wreck.

In response to the statement showing next closing date of July 21, 1988, Gottschalk sent a payment for $269.55 on August 21, 1988. He received the statement with next closing date of August 19, 1988, which showed a total premium due of $545.60 and did not reflect the $269.55 payment. At this point, Gottschalk believed that he was only 30 days in arrears and not subject to cancellation under the terms of

---

[1] The dates checks were written prior to the wreck were January 26, 1988; February 27, 1988; April 3, 1988; May 8, 1988; June 12, 1988; July 17, 1988; and August 21, 1988.

the policy and the notices printed on the statements. On September 19, he sent $276.05, the remainder of the $545.60.

When Gottschalk had called to report the accident, sometime between its occurrence and September 19, he was told that there was some question about coverage.

On September 19, he opened the last statement, including the cancellation notice, as well as a letter dated August 26, 1988. That letter acknowledged the payment of $269.55, but stated that USAA was holding the partial payment "pending receipt of the additional amount of $552.10 postmarked prior to September 7, 1988. If payment . . . is not received as required, the cancellation will take effect and your partial payment will be returned." On September 20, a postal money order for the $552.10 was sent by overnight mail to USAA. Gottschalk's last two premium checks, including the one being held, were both processed by USAA on September 29, and no money was returned.

On September 21, USAA sent a letter reflecting cancellation effective September 7 and a "total return premium" of $590.68. This was explained as a computer resolution and no money was actually returned to Gottschalk. A "new" policy declaration was issued dated September 28, reflecting coverage from September 21, 1988 through March 21, 1989.

In 1986, Gottschalk had received a cancellation notice due to late payment but, upon payment, was notified that the cancellation was rescinded and coverage was continued without a lapse.

(a) In this light, it cannot be said as a matter of law that Gottschalk was 60 days in arrears on his payments and that the policy was legally cancelled. Therefore, this issue was appropriately left for the jury's resolution. OCGA § 9-11-50 (a); *Southern Store &c. Co. v. Maddox*, 195 Ga. App. 2, 3 (1) (392 SE2d 268) (1990).

(b) Even assuming, however, that the payments were 60 days in arrears, as alleged by USAA, this arrearage had existed since February 1988, according to the testimony of Nigrete, the USAA representative.

Therefore, the issue of mutual departure, OCGA § 13-4-4, was raised.

"While we recognize that a departure from the terms of a contract which is relied upon by one of the parties so as to require a notice of intention to insist on strict compliance with the original contract terms under the provisions of [OCGA § 13-4-4] must be mutual between the parties and intended, and must be such as, in law, to make practically a new agreement as to the stipulations contained in the original contract [cits.], yet, whether there has been such a mutual and intended departure so as to make practically a new agreement is generally a question for a jury to determine. [Cit.]" *Continen-*

*tal Cas. Co. v. Union Camp Corp.*, 230 Ga. 8, 11 (1) (195 SE2d 417) (1973); *Holland v. Allstate Ins. Co.*, 200 Ga. App. 668, 669 (1) (409 SE2d 79) (1991).

Such a finding, made by the jury under proper instructions and supported by "any evidence," as here, is conclusive on this court. *Travelers Ins. Co. v. Adkins*, 200 Ga. App. 278, 279 (4d) (407 SE2d 775) (1991); *Gen. American Life Ins. Co. v. Samples*, 167 Ga. App. 622 (1) (307 SE2d 51) (1983).

Therefore, the first enumeration is without merit.

2. The second enumeration contends USAA was entitled to a new trial under OCGA § 5-5-21. This ground is addressed to the trial court's discretion alone and we cannot say that it was abused by denying the motion for new trial. *Towns v. State*, 185 Ga. App. 545 (365 SE2d 137) (1988).

3. At the time Nigrete testified, she wrote down the dates and amounts of payments, the due dates, and the date payment was processed by USAA on large pieces of paper. USAA tendered that chart, Exhibit 7, into evidence. While the court allowed counsel to use the exhibit during their arguments, it was not allowed out with the jury over the objection of Gottschalk, which is enumerated as error.

There was no error. In *Housing Auth. of City of Atlanta v. Goolsby*, 136 Ga. App. 156 (1) (220 SE2d 466) (1975), a witness in a condemnation case wrote computations on a blackboard, which the condemnor tendered into evidence. "The court properly excluded the evidence. 'The best evidence of the expert witness' opinion of the cost . . . was his own testimony to that effect, not the worksheet which he had prepared in order to assist him in presenting the testimony.' [Cit.] The same is true where the recapitulation is placed on a blackboard; to allow it in the jury room would give double emphasis to the testimony. . . ." Id. at 156-157. See *McClure v. State*, 163 Ga. App. 236, 238 (3) (293 SE2d 496) (1982).

4. Finally, USAA enumerates the court's holding that the policy and payment invoices were ambiguous and instructing the jury to resolve those ambiguities.

After giving the charge, the court directed that all the evidence, including the policy and the premium notices, be collected and given to the jury. He inquired if counsel had seen the documents and then stated that "I have reviewed the evidence in the case and those writings and I do find that there was an ambiguity in several of the writings and that the normal rules of construction . . . did not assist the Court sufficiently enough so that the Court can resolve the ambiguities, and as the result thereof I did turn the same over to the jury for their consideration."

The only objection voiced was that USAA contended that the "policy language" was not ambiguous and it therefore objected to any

charge on ambiguity.

We find no error in the court's analysis of this policy and the premium statements. See *Travelers Ins. Co. v. Blakey*, 255 Ga. 699 (342 SE2d 308) (1986); *Copy Systems of Savannah v. Page*, 197 Ga. App. 435, 436 (398 SE2d 784) (1990). Even accepting that there was no ambiguity in the policy itself, there was ambiguity in the "delinquency" message printed on the notices and the information on the back regarding the 30- and 60-day periods.

*Judgment affirmed. Pope, C. J., and Birdsong, P. J., concur.*

Decided February 15, 1994.

*Savell & Williams, John C. Parker, Swift, Currie, McGhee & Hiers, Michael A. Ryder, Kelli A. Andrew*, for appellant.

*Geiger & Pierce, James N. Geiger, McKenney, Jordan & Carey, Jane M. Jordan, Martin, Snow, Grant & Napier, Cubbedge Snow, Jr.*, for appellee.